David M. STERN et al., Plaintiffs,

v.

LUCY WEBB HAYES NATIONAL TRAINING SCHOOL FOR DEACONESSES AND MISSIONARIES et al., Defendants.

Civ. A. No. 267-73.

United States District Court, District of Columbia.

Nov. 30, 1973.

Alan S. Novins, William John Lamont, Martin Lobel, Washington, D. C., for plaintiffs.

Thomas M. Raysor, Richard W. Galiher, Jr., Godfrey L. Munter, John L. Hamilton, Nicholas D. Ward, Daniel V. S. McEvily, Ward H. Oehmann, Bernard I. Nordlinger, John P. Arness, Michael P. Bentzen, W. John Amerling, Jr., Leonard C. Collins, George E. Monk, Andrew T. Altmann, Washington, D. C., for defendants.

## MEMORANDUM AND ORDER

GESELL, District Judge.

This is a class action. The amended complaint filed April 17, 1973, claims in several counts that patients of Sibley Hospital have been damaged in that they were required to pay excessive amounts for hospital services as a result of a conspiracy among certain trustees and their affiliated businesses. The conspiracy is alleged to constitute a breach of trust and a violation of the Clayton Act, 15 U.S.C. § 15. The Hospital is named defendant only in the antitrust count.

The Hospital has informally afforded substantial discovery to plaintiffs. There have been extensive pretrial proceedings. As a result, the list of defendants was revised and the theory of the action sharpened. A motion by plaintiffs to certify the classes and motions of various defendants for partial summary judgment challenging the standing of plaintiffs to proceed with the antitrust count are now before the Court. The motions are opposed and ripe for determination following receipt of various undisputed documents, consideration of voluminous briefs and full argument.

### Antitrust

The question of plaintiffs' standing, individually or as a class, to assert the antitrust claim must first be considered.

The amended complaint charges that commencing before 1960 various institutions, primarily banks and savings associations, and their officials on the Hospital Board conspired with the Hospital itself "to allocate Sibley's financial service business among themselves on terms and rates specially favorable to defendant financial institutions, and imposing excessive costs for financial services on the patients utilizing Sibley's alleged 'without profit' services." Particularized references are made to interest-free bank accounts, charging of excessive interest rates on loans to the Hospital, and the alleged imposition of other financial charges on the Hospital which the Hospital could have reduced by competitive means. The agreement is claimed to have included a plan ultimately to recoup these losses to Hospital income by raising the charges for patient services. Treble damages for all members of the class against all defendants except the Hospital are sought.

Plaintiffs contend that they have standing for two principal reasons. First, they assert that they have been directly injured by the alleged conspiracy, and, second, they emphasize that because the Hospital has declined to proceed against the other conspirators there is no one other than the patients of this non-profit hospital who can act to correct the abuses claimed to exist.

This second argument is clearly without merit. The courts have interpreted the Clayton Act to grant standing under narrowly delineated circum-

stances, and equitable considerations would not justify disregard of this body of law and the congressional intent that it interprets. If plaintiffs otherwise lack standing, they cannot gain that status simply because others more directly injured have decided not to assert their own rights.[1]

■ Upon careful analysis of the statute, it is apparent that plaintiffs' alleged injuries do not satisfy the requirements of standing under the Clayton Act. Section 4 of the Act provides relief through treble damages to "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . ." As the Supreme Court has noted, "[t]he lower courts have been virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." Hawaii v. Standard Oil Co., 405 U.S. 251, 263 n. 14, 92 S.Ct. 885, 891, 31 L.Ed.2d 184 (1972). The courts have evolved essentially two tests—(1) the direct injury test, and (2) the target area test—to determine whether a sufficient nexus exists between an alleged antitrust violation and an injury allegedly caused thereby, so as to confer standing upon the injured party to bring a treble damage action.

It must be recognized at the outset that plaintiffs are unable to show that the alleged conspiracy to monopolize the Hospital's financial services on terms disadvantageous to the Hospital was directed at the patients. To be sure, it was apparent that overhead would rise and that this, in turn, might be a factor,

among many others, in raising Hospital charges; but the object was to obtain economic benefit from the Hospital, not to overcharge. The damage, in short, while somewhat foreseeable, was indirect, and only remotely consequential. While the Hospital itself is named a conspirator, the plaintiffs cannot show any deliberate participation of this entity in the combination. Indeed, they want no damages from it. If some of its trustees abused their trust for their own advantage, this conduct is not sufficient to change the Hospital from a victim to a conspirator. It is the theory of the amended complaint that the Hospital itself was injured by being overcharged for financial services and such documentary proof as there appears to be is to this effect.

■ Plaintiffs were purchasers of a variety of hospital health services from the Hospital, and they say they sustained injury through their contractual relationship with it. The law is well settled, however, that the losses suffered by the customers of a directly injured party are remote and indirect, and do note give rise to standing under the antitrust laws. Commonwealth Edison Co. v. Allis-Chalmers Manufacturing Co., 315 F.2d 564 (7th Cir.), cert. denied sub nom., Illinois v. Commonwealth Edison Co., 375 U.S. 834, 84 S.Ct. 64, 11 L.Ed. 2d 64 (1963); United Egg Producers v. Bauer International Corp., 312 F.Supp. 319 (S.D.N.Y.1970); City of Philadelphia v. Westinghouse Electric Corp., 1961 Trade Cases ¶ 70,143 (E.D.Pa. 1961).

This is true even where the effect was foreseeable and demonstrable,[2] as these and other cases have repeatedly empha-

---

[1]. If, as plaintiffs claim, the Hospital was victimized by the conspiracy, the trustees not named defendants, after excluding defendant trustees, could have authorized the Hospital to act, but they determined they would not do so. Banks and other financial institutions could possibly also bring a comparable action claiming they were competitively injured. The United States could also have proceeded, seeking appropriate civil and criminal remedies.

[2]. It is by no means clear from the proofs preliminarily before the Court that plaintiffs could establish such a clear, ascertainable effect because of the variety of factors affecting pricing of hospital services and the paramount influence of salaries and occupancy census upon the total equation, to say nothing of rising expenses for equipment, food services and the like.

sized. *See* Nationwide Auto Appraiser Service, Inc. v. Association of Casualty and Surety Companies, 382 F.2d 925 (10th Cir. 1967); Productive Inventions, Inc. v. Trico Products Corp., 224 F.2d 678 (2d Cir. 1955), cert. denied, 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956); Minersville Coal Co., Inc. v. Anthracite Export Association, 335 F. Supp. 360 (M.D.Pa.1971); Snow Crest Beverages v. Recipe Foods, 147 F.Supp. 907 (D.Mass.1956).

The parties have relied heavily on the Supreme Court's decision in Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L. Ed.2d 1231 (1968). Defendants assert that *Hanover Shoe* bars recovery by an injured party's customers unless that injury is passed on by means of an explicit cost-plus arrangement. Plaintiffs argue that a non-profit hospital necessarily passes on increased expenses to its patients in a manner which satisfies the *Hanover Shoe* exception. The parties probably read too much into the decision, which dealt with a vendor's defense rather than the standing of his customers. However, when read in light of the earlier cases cited above, *Hanover Shoe* is at least consistent with the ruling that an ultimate purchaser can only sue under the Clayton Act if he can establish that the alleged conspiracy increased the cost to the vendor of a discrete product which was then sold to him at a necessarily higher price. *Compare* Mangano v. American Radiator & Standard Sanitary Corp., 438 F.2d 1187 (3rd Cir. 1971), *and* Donson Stores, Inc. v. American Bakeries Co., 58 F.R.D. 481 (S.D.N.Y.1973), *with* In re Master Key Antitrust Litigation, 1973 Trade Cases ¶ 74,680 (D.Conn.1973), *and* Boshes v. General Motors Corp., 59 F.R.D. 589 (N.D.Ill.1973). Plaintiffs can make no such showing: they purchased hospital rather than financial services, and cost fluctuations in the latter are not automatically reflected in the prices of the former. Under such circumstances, as *Hanover Shoe* itself recognized, calculating the precise amount of damages

"would normally prove insurmountable." 392 U.S. at 493, 88 S.Ct. 2224.

The most realistic view of standing in situations such as that presented here is to apply the "target area" test, which denies standing if the plaintiff's activity occurs outside the area of the economy endangered by the breakdown of competitive conditions. Here, of course, there is an alleged elimination of competition in financial services. It is clear that the targets of the alleged violation were (1) financial institutions who competed with defendants in that field, and (2) the Hospital, which itself purchased the financial services involved. Plaintiffs' activity, as the "purchasers of hospital health services," was not within the area of the economy in which the elimination of competition occurred, and thus plaintiffs lack standing to sue. Conference of Studio Unions v. Loew's, Inc., 193 F. 2d 51 (9th Cir. 1951), cert. denied, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952); In re Multidistrict Vehicle Air Pollution, 481 F.2d 122 (9th Cir. 1973); Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc., 454 F.2d 1292, 1295, 1296 (2d Cir. 1971), cert. denied, 406 U.S. 930, 92 S.Ct. 1776, 32 L. Ed.2d 132 (1972); Billy Baxter, Inc. v. Coca-Cola Co., 431 F.2d 183, 187 (2d Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed. 826 (1971); Contreras v. Grower Shipper Vegetable Ass'n of Central California, 1971 Trade Cases ¶ 73,592 (N.D.Cal.1971), aff'd (9th Cir. 1973); Bywater v. Matshushita Electric Industrial Co., Ltd., 1971 Trade Cases ¶ 73,759 (S.D.N.Y.1971). Furthermore, as the Second Circuit has pointed out, plaintiffs are not brought into the target area by allegations of complicity on the part of the party through whom they were injured—in the present case, the Hospital:

If the plaintiff is not within the "target area," then it is legally immaterial whether the person through whom the plaintiff derives his injury was a member of the conspiracy or was innocent of any wrongdoing. A plaintiff not a target of any antitrust vio-

lation does not become a target by virtue of the culpability of its lessee, patentee, franchisee, supplier, customer or debtor.

Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc., *supra*, 454 F.2d at 1296. *See also* Fields Productions, Inc. v. United Artists Corp., 318 F.Supp. 87 (S.D.N.Y.1969), aff'd, 432 F.2d 1010 (2d Cir., 1970), cert. denied, 401 U.S. 949, 91 S.Ct. 932, 28 L.Ed.2d 232 (1971); Melrose Realty Co. v. Loew's, Inc., 234 F.2d 518 (3rd Cir.), cert. denied, 352 U.S. 890, 77 S.Ct. 128, 1 L.Ed.2d 85 (1956).

This lack of standing requires dismissal of the Clayton Act count as to all defendants. Perforce this also requires the Court to refuse to certify plaintiffs as a class qualified to prosecute such a claim. It should be noted, however, that all of the factors which the Court discusses below as relating to certification of the classes under the breach of trust counts of the amended complaint are equally applicable to the antitrust claim and indeed the difficulties of formulating a coherent class serve to emphasize the wisdom of the standing ruling just made.

### Class Certification

■ Following a hearing on various motions to dismiss, the Court ruled, on June 8, 1973, that "Plaintiffs purporting to represent a class of users of the Hospital's services have a sufficient special interest to challenge the conduct of the trustees operating this charitable institution on a theory of breach of trust." Plaintiffs unquestionably may proceed on behalf of all patients to press for appropriate injunctive relief and possibly an award of damages to be paid into the Hospital's funds and, as such, will be certified as an appropriate qualified class under Rule 23(b)(2) of the Federal Rules of Civil Procedure.[3]

A serious question, however, is presented as to whether a Rule 23(b)(3) class should be certified. The Court is not satisfied that the named plaintiffs will fairly and adequately protect the interests of the class and, in any event, is convinced that the difficulties likely to be encountered in the management of the class are insurmountable and wholly out of all proportion to the monetary results that might be achieved for individual members of the class, which numbers some 10,000.

It is apparent from the facts already before the Court that there is no direct relationship between the alleged breaches of trust and an increase in the charges to a particular patient. It is also apparent that patient charges reflect a variety of factors affecting the Hospital's profit and loss—many unrelated to the alleged conspiracy and indeed often beyond the Hospital's control. Moreover, the Hospital provides many different services, the costs for each of which are constantly changing. The net effect is to create a number of classes separated by the type of service the patient received and the date on which he received it. Within each class it becomes doubly complex to sort out those who were or were not affected by an increase attributed to a particular breach of trust. Beyond this, the insurers who bear by far the bulk of the ultimate expense are not among those purporting to represent the so-called class. Conflicts are certain to arise between various groups of potential claimants. Thus, the named plaintiffs do not appear to be sufficiently typical of the various classes and their subdivisions.

In short, the difficulties of attempting to manage the class are almost insurmountable. Moreover, the breaches of trust, albeit serious and substantial from the Hospital's point of view, may well involve a minor amount in the re-

---

3. Since plaintiffs have as yet neither formally requested that damages be paid into the Hospital's funds nor established their standing to seek such relief, the Court need not at this time determine whether certification under Rule 23(b)(1) is appropriate.

calculation of health charges and involve almost miniscule recovery in many instances when spread over the entire patient group. Under these circumstances, the Court believes that the plaintiff patients may act to prevent continued injury to the Hospital caused by the trustees' self-dealing and overreaching, if any, but that they cannot sue as a Rule 23(b)(3) class to recover personally for damages resulting from mismanagement by the Hospital's trustees.