David M. STERN et al., Plaintiffs,

v.

LUCY WEBB HAYES NATIONAL TRAINING SCHOOL FOR DEACONESSES AND MISSIONARIES, et al., Defendants.

Civ. A. No. 267-73.

United States District Court, District of Columbia.

July 30, 1974.

Alan S. Novins, Alan S. Mark, Lobel, Novins & Lamont, Washington, D. C., for plaintiffs.

Thomas M. Raysor, Washington, D. C., for defendant Hospital.

John L. Hamilton, Washington, D. C., for defendant McLachlen.

Richard W. Galiher, Washington, D. C., for defendant Reed.

Bernard I. Nordlinger, for defendant Jones.

Michael P. Bentzen, Washington, D. C., for defendant Smith.

Calvin H. Cobb, Jr., Washington, D. C., for defendant Ferris.

## MEMORANDUM OPINION

GESELL, District Judge.

This is a class action which was tried to the Court without a jury. Plaintiffs were certified as a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure and represent patients of Sibley Memorial Hospital, a District of Columbia non-profit charitable corporation organized under D.C.Code § 29–1001 et seq. They challenge various aspects of the Hospital's fiscal management. The amended complaint named as defendants nine members of the Hospital's Board of Trustees,[1] six financial institutions, and the Hospital itself. Four trustees and one financial institution were dropped by plaintiffs prior to trial, and the Court dismissed the complaint as to the remaining financial institutions at the close of plaintiffs' case.

Several different causes of action were initially alleged. Some were rejected after hearing pretrial motions. Others were dismissed at the close of plaintiffs' evidence and still others are now awaiting determination following completion of the record. The most significant pretrial rulings have been fully covered in a prior opinion, Stern v. Lucy Webb Hayes Nat. Train. Sch. for Deacon. & M., 367 F.Supp. 536 (D.D.C. 1973). This Memorandum Opinion will set forth the basis of the Court's determinations made at the close of plaintiffs' case and will, in addition, resolve the remaining issues which went to full trial. All of these matters have been fully briefed and argued and proposed findings of fact have been submitted, all of which the Court has carefully considered. The record consists of 1,169 pages of transcript and 137 exhibits.

The two principal contentions in the complaint are that the defendant trustees conspired to enrich themselves and certain financial institutions with which they were affiliated by favoring those institutions in financial dealings with the Hospital, and that they breached their fiduciary duties of care and loyalty in the management of Sibley's funds. The defendant financial institutions are said to have joined in the alleged conspiracy and to have knowingly benefited from the alleged breaches of duty. The Hospital is named as a nominal defendant for the purpose of facilitating relief.

### I. Corporate History.

The Lucy Webb Hayes National Training School for Deaconesses and Missionaries was established in 1891 by the Methodist Women's Home Missionary Society for the purpose, in part, of providing health care services to the poor of the Washington area. The School was incorporated under the laws of the District of Columbia as a charitable, benevolent and educational institution by instrument dated August 8, 1894. During the following year, the School built the Sibley Memorial Hospital on North Capitol Street to facilitate its charitable work. Over the years, operation of the Hospital has become the School's principal concern, so that the two institutions have been referred to synonymously by all parties and will be so treated in this Opinion. As increasing demands were made upon Sibley's facilities, the Hospital was renovated several times. Finally, in the mid-1950's, it was decided to move the Hospital to a new location on Loughboro Road in Northwest Washington. The nearby Hahnemann Hospital, another Methodist charity, was merged with Sibley in 1956 in anticipation of this move.[2] The new Sibley Memorial Hospital was dedicated on June 17, 1962.

---

1. The directors of the Hospital are termed "trustees" under the by-laws. However, the use of the term by the Court does not imply a legal conclusion as to the duty they owe the Hospital and its patients.

2. Hahnemann has been retained as a separate corporate entity solely for the purpose of receiving certain charitable contributions under the terms of wills and trust agreements which predate the merger. Sibley's trustees also constitute the Hahnemann Board, and Hahnemann funds have been maintained at several of the defendant banks.

In 1960, shortly after ground was broken for the new building, the Sibley Board of Trustees revised the corporate by-laws in preparation for an expected increase in the volume and complexity of Hospital business following the move. Under the new by-laws, the Board was to consist of from 25 to 35 trustees, who were to meet at least twice each year. Between such meetings, an Executive Committee was to represent the Board, and was authorized, *inter alia*, to open checking and savings accounts, approve the Hospital budget, renew mortgages, and enter into contracts. A Finance Committee was created to review the budget and to report regularly on the amount of cash available for investment. Management of those investments was to be supervised by an Investment Committee, which was to work closely with the Finance Committee in such matters.

In fact, management of the Hospital from the early 1950's until 1968 was handled almost exclusively by two trustee officers: Dr. Orem, the Hospital Administrator, and Mr. Ernst, the Treasurer. Unlike most of their fellow trustees, to whom membership on the Sibley Board was a charitable service incidental to their principal vocations, Orem and Ernst were continuously involved on almost a daily basis in the affairs of Sibley. They dominated the Board and its Executive Committee, which routinely accepted their recommendations and ratified their actions. Even more significantly, neither the Finance Committee nor the Investment Committee ever met or conducted business from the date of their creation until 1971, three years after the death of Dr. Orem. As a result, budgetary and investment decisions during this period, like most other management decisions affecting the Hospital's finances, were handled by Orem and Ernst, receiving only cursory supervision from the Executive Committee and the full Board.

Dr. Orem's death on April 5, 1968, obliged some of the other trustees to play a more active role in running the Hospital. The Executive Committee, and particularly defendant Stacy Reed (as Chairman of the Board, President of the Hospital, and *ex officio* member of the Executive Committee), became more deeply involved in the day-to-day management of the Hospital while efforts were made to find a new Administrator. The man who was eventually selected for that office, Dr. Jarvis, had little managerial experience and his performance was not entirely satisfactory. Mr. Ernst still made most of the financial and investment decisions for Sibley, but his actions and failures to act came slowly under increasing scrutiny by several of the other trustees, particularly after a series of disagreements between Ernst and the Hospital Comptroller which led to the discharge of the latter early in 1971.

Prompted by these difficulties, Mr. Reed decided to activate the Finance and Investment Committees in the Fall of 1971.[3] However, as Chairman of the Finance Committee and member of the Investment Committee as well as Treasurer, Mr. Ernst continued to exercise dominant control over investment decisions and, on several occasions, discouraged and flatly refused to respond to inquiries by other trustees into such matters. It has only been since the death of Mr. Ernst on October 30, 1972, that the other trustees appear to have assumed an identifiable supervisory role over investment policy and Hospital fiscal management in general.

Against this background, the basic claims will be examined.

## II. *Conspiracy.*

Plaintiffs first contend that the five defendant trustees and the five defendant financial institutions were involved

3. Although the committees had never met prior to 1971, the Board had duly elected trustees to serve on them every year since their creation in 1960. The by-laws were simply ignored.

in a conspiracy to enrich themselves at the expense of the Hospital. They point to the fact that each named trustee held positions of responsibility with one or more of the defendant institutions as evidence that the trustees had both motive and opportunity to carry out such a conspiracy. The extent of these interlocking duties and interests is revealed by the following table:

TABLE I

| Hospital Responsibilities | Defendant Trustees | Financial Institution Responsibilities |
|---|---|---|
| SIBLEY<br>Trustee (1956–)<br>Executive Com. (1961–)<br>Finance Com. (1961–)<br>Investment Com. (1961–)<br>Board Chairman (1960–)<br>President (1968–72; 1973–) | STACY M. REED | SECURITY NATIONAL BANK<br>Director (1930–)<br>Executive Com. (1937–)<br>Minor stockholder |
| SIBLEY<br>Trustee (1956–)<br>Investment Com. (1960–73) | LANIER P. McLACHLEN | McLACHLEN NATIONAL BANK<br>Director (1974–)<br>Board Chairman (1953–73)<br>President (1922–54)<br>Principal stockholder (8.1%) |
| SIBLEY<br>Trustee (1956–)<br>Finance Com. (1973–)<br>Investment Com. (1962–70)<br>Acting Treas. (1972–73) | GEORGE M. FERRIS | FERRIS & CO.<br>Senior Partner (–1971)<br>Board Chairman (1971–)<br>Principal stockholder (42%) |
| SIBLEY<br>Trustee (1959–)<br>Executive Com. (1959–)<br>Finance Com. (1960–73)<br>Investment Com. (1971–73) | EDWARD K. JONES | INTERSTATE BUILDING ASSOC.<br>Director (1932–)<br>Executive Com. (1932–)<br>Board Chairman (1969–)<br>President (1954–69)<br>Minor stockholder<br><br>RIGGS NATIONAL BANK<br>Director (1967–)<br>Executive Com. (1967–74)<br>Minor stockholder |
| SIBLEY<br>Trustee (1964–)<br>Executive Com. (1964–)<br>Investment Com. (1967–73) | FRED W. SMITH | RIGGS NATIONAL BANK<br>Advisory Director (1964–)<br>Minor stockholder<br><br>JEFFERSON FEDERAL S. & L.<br>Director (1954–)<br>Executive Com. (1957–)<br>President (1959–) |

Plaintiffs further contend that the defendants accomplished the alleged conspiracy by arranging to have Sibley maintain unnecessarily large amounts of money on deposit with the defendant banks and savings and loan associations, drawing inadequate or no interest. As shown by table II, below, the Hospital in fact maintained much of its liquid assets in savings and checking accounts rather than in Treasury bonds or investment securities, at least until the investment review instituted by Mr. Reed late in 1971. In that year, for example, more than one-third of the nearly four million dollars available for investment was deposited in checking accounts, as compared to only about $135,000 in securities and $311,000 in Treasury bills. Although substantial sums were used to purchase certificates of deposit, which produce at least a moderate amount of income, the Hospital occasionally purchased a certificate yielding lower interest rates than were available at other institutions.

TABLE II

SUMMARY OF SIBLEY FINANCIAL ASSETS

1967–1972, as of December 31st

| Type of Accounts | 1972 | 1971 | 1970 | 1969 | 1968 | 1967 |
|---|---|---|---|---|---|---|
| Sibley checking | $ 501,333 | 1,148,769 | 1,265,288 | 588,735 | 522,174 | 655,084 |
| Sibley savings | 2,015,448 | 826,435 | 588,979 | 866,374 | 774,661 | 646,649 |
| Sibley certificates | 2,043,435 | 2,029,211 | 1,325,000 | 900,000 | 900,000 | 900,000 |
| Sibley U.S. Treasuries | 310,764 | 310,436 | 383,786 | 220,000 | 220,000 | ——— |
| Sibley securities (at cost) | 135,749 | 135,646 | 140,446 | 71,621 | 71,621 | 70,052 |
| All Hahnemann net financial assets | 413,152 | 588,464 | 538,755 | 505,046 | 687,909 | 427,638 |
| TOTAL | $5,419,881 | 5,038,961 | 4,242,254 | 3,151,776 | 3,176,365 | 2,699,423 |

It is also undisputed that most of these funds were deposited in the defendant financial institutions. A single checking account, drawing no interest whatever and maintained alternately at Riggs National Bank and Security National Bank, usually contained more than $250,000 and on one occasion grew to nearly $1,000,000.

Defendants were able to offer no adequate justification for this utilization of the Hospital's liquid assets. By the same token, however, plaintiffs failed to establish that it was the result of a conscious direction on the part of the named defendants. As mentioned above, it was Mr. Ernst alone rather than any of the defendant trustees who main-

tained almost exclusive control over the Hospital's investments until his death in 1972. As Treasurer, he could shift money between banks or accounts within banks and purchase or sell securities without consulting any other trustee. Since the Investment and Finance Committees never met, only Dr. Orem and a few of the other officers apparently were aware of Mr. Ernst's investment policies. While it is true that a yearly audit was made available to the Board and that the Executive Committee had to approve the opening of new accounts, these matters were treated as mere formalities. All of the defendant trustees testified that they approved Ernst's recommendations as a matter of course, rarely if ever read the relevant details of audits critically, and generally left investment decisions to the presumed expertise of Mr. Ernst. Several also commented that the Treasurer regarded their suggestions as "interference" in these matters and none forced the issue.

Mr. Ernst's own reasons for pursuing this conservative investment policy are not altogether clear. It has been suggested that his experience in the Depression was an important contributing factor. That same experience undoubtedly helps explain his belief that Sibley should maintain close relationships with a few local banks and his evident decision to favor those banks which held a mortgage on the Hospital and which had interlocking directorships with the Sibley Board.

There is no evidence that the defendant trustees reached a mutual agreement to direct or even to encourage Ernst in such favoritism. It is true that the trustees frequently approved transactions which benefited institutions with which they were affiliated and that occasionally a particular trustee would even seek out such an arrangement, but plaintiffs have not shown that any of these decisions derived from a conspiratorial agreement. Moreover, when the Board's own investigations brought the inadequacy of Mr. Ernst's policies home to the Board, the trustees moved toward a more realistic investment program in a manner that negates existence of a prior agreement. Significant reductions in bank deposits have been made, and the newly elected Treasurer is attempting—with mixed success—to hold demand deposits below $500,000, a level which he deems adequate for the operation of the Hospital.

Plaintiffs also attempted to bolster the conspiracy theory by pointing to two other Hospital transactions: the continuation of a mortgage with the defendant financial institutions and the signing of an investment advisory agreement with Ferris & Co. The mortgage in question dates back to the late 1950's, when the Sibley Board began negotiations with various local banks to obtain a loan to finance construction of the new hospital building. When these negotiations fell through, the Board obtained an adequate loan commitment from a Texas bank. Although local banks had earlier refused to assist the Hospital, several of the trustees then organized a syndicate of Washington banks willing to provide the loan on equally favorable terms to the Texas proposal and persuaded the Board to accept the local offer. As a result, the syndicate agreed in 1959 to lend Sibley $3,000,000, secured by a mortgage on the hospital. This sum was increased to $3,500,000 in 1961.

The loan was renewed in 1969 and is still partially outstanding. Although Sibley probably had sufficient funds to pay off the loan without totally impairing its ability to meet obligations as they become due, the Executive Committee voted instead for renewal. The cash flow would have put operations on a tight basis and the trustees had in mind that available money might well be needed for the renovation of certain property owned by Sibley.

The terms of this loan were entirely fair to Sibley at all times. There is no indication that the Board could have received better terms elsewhere or that it failed diligently to seek an optimum arrangement at the time of the original

loan. The renewal in 1969 also appears to have been a reasonable, good-faith business decision. There is no indication that either decision was motivated by a desire to benefit the banks involved at the Hospital's expense.

The idea of employing an investment service was raised by Mr. Jones at the meeting of Sibley's Investment Committee. It was decided that Mr. Ferris, a member of that committee, should present a proposal from Ferris & Co., of which Mr. Ferris was Chairman of the Board and principal stockholder, for the provision of continuing investment advisory services to Sibley. Mr. Ferris presented such a proposal on April 12, 1971, and the committee voted to recommend approval. Mr. Ferris urged and may have voted in favor of that recommendation at an informal session of the Investment Committee, but thereafter he resigned from the Investment Committee to avoid further possible conflicts of interest. For a short time he then served as Acting Treasurer over the objection of some trustees. Upon formal approval by the Hospital's counsel and the Executive Committee, of which Ferris was not a member, Sibley entered into the "Investment Advisory Agreement" with Ferris & Co., which written contract is still in effect today. Plaintiffs concede, and the Court finds, that Ferris & Co.'s fee for investment service was fair and equitable. Plaintiffs concede that Ferris & Co. did a good job, although shifts in market prices resulted in some losses in the account which, incidentally, would not have occurred if the Hospital had kept the money in certificates of deposit. No conspiratorial inference can be drawn from this course of dealing.

■ Thus, plaintiffs have not established a conspiracy between the named trustees and the named financial institutions or between the members of each group. There is no proof that the financial institutions ever had any contact between themselves relating to the handling of Sibley's business, its apportion-

ment or even its existence. The trustees as a group were not shown to have solicited business for any particular bank or savings and loan association, and, indeed, it appears that most of the Sibley business done with these interlocking institutions was initiated by Hospital officers without the advance knowledge or direction of the trustees. Mr. George Ferris did solicit business for his firm, but only after he was asked to advise on the handling of certain Hospital investments. The contract made with Ferris & Co. was approved by counsel for the Hospital and by the Executive Committee of the Board, including several of the defendant trustees, in the full realization that Ferris' recommendations would diminish attractive bank accounts maintained by the Hospital in several of the defendant financial institutions.

There being no proof of any express agreement, written or oral, relating to the placing or division of Hospital business, the conspiracy claim depends upon showing parallel conduct sufficient to bring the facts within such cases as Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954); and Interstate Circuit, Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939). Here also the factual showing is wholly deficient. Credible testimony of the trustees and representatives of the financial institutions flatly denies conspiracy. Beyond this, there is no cognizable pattern of dealing, no discussion, no complaint of deviation from a course of agreed conduct, in fact nothing from which a conspiracy between the defendants can be implied beyond the simple fact that the Hospital did considerable business with the financial institutions that had some interlocking ties to its Board of Trustees. This is not enough, and the conspiracy claim failed for lack of proof.

### III. *Breach of Duty.*

Plaintiffs' second contention is that, even if the facts do not establish a conspiracy, they do reveal serious breaches

of duty on the part of the defendant trustees and the knowing acceptance of benefits from those breaches by the defendant banks and savings and loan associations.

### A. *The Trustees.*

■ Basically, the trustees are charged with mismanagement, nonmanagement and self-dealing. The applicable law is unsettled. The charitable corporation is a relatively new legal entity which does not fit neatly into the established common law categories of corporation and trust. As the discussion below indicates, however, the modern trend is to apply corporate rather than trust principles in determining the liability of the directors of charitable corporations, because their functions are virtually indistinguishable from those of their "pure" corporate counterparts.

### 1. *Mismanagement.*

■ Both trustees and corporate directors are liable for losses occasioned by their negligent mismanagement of investments. However, the degree of care required appears to differ in many jurisdictions. A trustee is uniformly held to a high standard of care and will be held liable for simple negligence, while a director must often have committed "gross negligence" or otherwise be guilty of more than mere mistakes of judgment. 1 Hornstein, Corporation Law and Practice § 446 (1959); Ballantine, Corporations § 63(a) (rev. ed. 1946); Bishop, "Sitting Ducks and Decoy Ducks: New Trends in the Indemnification of Corporate Directors and Officers," 77 Yale L.J. 1078, 1101 (1968). *See also* Mann v. Commonwealth Bond Corp., 27 F.Supp. 315, 320 (S.D.N.Y. 1938).

■ This distinction may amount to little more than a recognition of the fact that corporate directors have many areas of responsibility, while the traditional trustee is often charged only with the management of the trust funds and can therefore be expected to devote more time and expertise to that task. Since the board members of most large charitable corporations fall within the corporate rather than the trust model, being charged with the operation of ongoing businesses, it has been said that they should only be held to the less stringent corporate standard of care. Beard v. Achenbach Mem. Hospital Ass'n, 170 F. 2d 859, 862 (10th Cir. 1948); Cary & Bright, The Law and the Lore of Endowment Funds: Report to the Ford Foundation 58–61 (1969). More specifically, directors of charitable corporations are required to exercise ordinary and reasonable care in the performance of their duties, exhibiting honesty and good faith. Beard v. Achenbach Mem. Hospital Ass'n, *supra*, at 862.

### 2. *Nonmanagement*

■■ Plaintiffs allege that the individual defendants failed to supervise the management of Hospital investments or even to attend meetings of the committees charged with such supervision. Trustees are particularly vulnerable to such a charge, because they not only have an affirmative duty to "maximize the trust income by prudent investment," Blankenship v. Boyle, 329 F. Supp. 1089, 1096 (D.D.C. 1971), but they may not delegate that duty, even to a committee of their fellow trustees. Restatement (Second) of Trusts § 171, at 375 (1959). A corporate director, on the other hand, may delegate his investment responsibility to fellow directors, corporate officers, or even outsiders, but he must continue to exercise general supervision over the activities of his delegates. *See, e.g.,* Model Bus. Corp. Act Ann. § 38 (1960), as amended (Supp. 1966). Once again, the rule for charitable corporations is closer to the traditional corporate rule: directors should at least be permitted to delegate investment decisions to a committee of board members, so long as *all* directors assume the responsibility for supervising such committees by periodically scrutinizing their work. Restatement (Second) of

Trusts § 379, comment b (1959); Cary & Bright, *supra,* at 61–65.

■ Total abdication of the supervisory role, however, is improper even under traditional corporate principles. A director who fails to acquire the information necessary to supervise investment policy or consistently fails even to attend the meetings at which such policies are considered has violated his fiduciary duty to the corporation. 3 Fletcher Cyc. Corp. (Perm.Ed.Rev. 1965) § 1091 (1965). While a director is, of course, permitted to rely upon the expertise of those to whom he has delegated investment responsibility, such reliance is a tool for interpreting the delegate's reports, not an excuse for dispensing with or ignoring such reports. *See* Heit v. Bixby, 276 F.Supp. 217, 231 (E. D.Mo.1967). A director whose failure to supervise permits negligent mismanagement by others to go unchecked has committed an independent wrong against the corporation; he is not merely an accessory under an attenuated theory of *respondeat superior* or constructive notice. 3 Fletcher Cyc. Corp. (Perm.Ed.Rev.1965) §§ 1065 et seq. *Cf.* DePinto v. Provident Security Life Ins. Co., 374 F.2d 37 (9th Cir.), cert. denied, 389 U.S. 822, 88 S.Ct. 48, 19 L.Ed.2d 74 (1967).

### 3. *Self-dealing*

■ Under District of Columbia Law, neither trustees nor corporate directors are absolutely barred from placing funds under their control into a bank having an interlocking directorship with their own institution. In both cases, however, such transactions will be subjected to the closest scrutiny to determine whether or not the duty of loyalty has been violated. Blankenship v. Boyle, 145 U.S.App.D.C. 111, 447 F.2d 1280 (1971); Mayflower Hotel Stockholders Protective Committee v. Mayflower Hotel Corp., 89 U.S.App.D.C. 171, 193 F.2d 666 (1951). A deliberate conspiracy among trustees or Board members to enrich the interlocking bank at the expense of the trust or corporation would, for example, constitute such a breach and render the conspirators liable for any losses. Bentz v. Vardaman Mfg. Co., 210 So.2d 35 (Sup.Ct.Miss. 1968). In the absence of clear evidence of wrongdoing, however, the courts appear to have used different standards to determine whether or not relief is appropriate, depending again on the legal relationship involved. Trustees may be found guilty of a breach of trust even for mere negligence in the maintenance of accounts in banks with which they are associated, Blankenship v. Boyle, *supra,* 329 F.Supp. at 1101–1102 n. 7 (D. D.C.1971) (dicta); 2 Scott on Trusts § 170.19, at 1362–64 (3d ed. 1967), while corporate directors are generally only required to show "entire fairness" to the corporation and "full disclosure" of the potential conflict of interest to the Board. Mayflower Hotel Stockholders Protective Committee v. Mayflower Hotel Corp., *supra.*

Most courts apply the less stringent corporate rule to charitable corporations in this area as well. *See, e.g.,* United States v. Mount Vernon Mortgage Corp., 128 F.Supp. 629 (D.D.C. 1954), aff'd, 98 U.S.App.D.C. 429, 236 F.2d 724 (1956), cert. denied, 352 U.S. 988, 77 S. Ct. 386, 1 L.Ed.2d 367 (1957); Gilbert v. McLeod Infirmary, 219 S.C. 174, 64 S.E.2d 524 (1951); Fowle Mem. Hospital Co. v. Nicholson, 189 N.C. 44, 126 S. E. 94 (1925). *See also* W. Porth, "Personal Liability of Trustees of Educational Institutions," 1 J. of College and U. L. 84, 87–88 (1973). It is, however, occasionally added that a director should not only disclose his interlocking responsibilities but also refrain from voting on or otherwise influencing a corporate decision to transact business with a company in which he has a significant interest or control. *See, e.g.,* Gilbert v. McLeod Infirmary, *supra.*

Although defendants have argued against the imposition of even these limitations on self-dealing by the Sibley trustees, the Hospital Board recently adopted a new by-law, based upon guide-

lines issued by the American Hospital Association, which essentially imposes the modified corporate rule described above:

Article XXVIII, Conflicts of Interests

Section 1.

Any duality of interest or possible conflict of interest on the part of any governing board member shall be disclosed to the other members of the board and made a matter of record through an annual procedure and also when the interest becomes a matter of board action.

Section 2.

Any governing board member having a duality of interest or possible conflict of interest on any matter shall not vote or use his personal influence on the matter, and he shall not be counted in determining the quorum for the meeting, even where permitted by law. The minutes of the meeting shall reflect that a disclosure was made, the abstention from voting, and the quorum situation.

Section 3.

The foregoing requirements shall not be construed as preventing the governing board member from briefly stating his position in the matter, nor from answering pertinent questions of other board members since his knowledge may be of great assistance.

Section 4.

Any new member of the board will be advised of this policy upon entering on the duties of his office.

 Having surveyed the authorities as outlined above and weighed the briefs, arguments and evidence submitted by counsel, the Court holds that a director or so-called trustee of a charitable hospital organized under the Non-Profit Corporation Act of the District of Columbia (D.C.Code § 29–1001 et seq.) is in default of his fiduciary duty to manage the fiscal and investment affairs of the hospital if it has been shown by a preponderance of the evidence that:

(1) while assigned to a particular committee of the Board having general financial or investment responsibility under the by-laws of the corporation, he has failed to use due diligence in supervising the actions of those officers, employees or outside experts to whom the responsibility for making day-to-day financial or investment decisions has been delegated; or

(2) he knowingly permitted the hospital to enter into a business transaction with himself or with any corporation, partnership or association in which he then had a substantial interest or held a position as trustee, director, general manager or principal officer without having previously informed the persons charged with approving that transaction of his interest or position and of any significant reasons, unknown to or not fully appreciated by such persons, why the transaction might not be in the best interests of the hospital; or

(3) except as required by the preceding paragraph, he actively participated in or voted in favor of a decision by the Board or any committee or subcommittee thereof to transact business with himself or with any corporation, partnership or association in which he then had a substantial interest or held a position as trustee, director, general manager or principal officer; or

(4) he otherwise failed to perform his duties honestly, in good faith, and with a reasonable amount of diligence and care.

 Applying these standards to the facts in the record, the Court finds that each of the defendant trustees has breached his fiduciary duty to supervise the management of Sibley's investments. All except Mr. Jones were duly and repeatedly elected to the Investment Committee without ever bothering to object when no meetings were called for more than ten years. Mr. Jones was a member of the equally inactive Finance Committee, the failure of which to report on the existence of investable funds was cited by several other defendants as a

reason for not convening the Investment Committee. In addition, Reed, Jones and Smith were, for varying periods of time, also members of the Executive Committee, which was charged with acquiring at least enough information to vote intelligently on the opening of new bank accounts. By their own testimony, it is clear that they failed to do so. And all of the individual defendants ignored the investment sections of the yearly audits which were made available to them as members of the Board. In short, these men have in the past failed to exercise even the most cursory supervision over the handling of Hospital funds and failed to establish and carry out a defined policy.

The record is unclear on the degree to which full disclosure preceded the frequent self-dealing which occurred during the period under consideration. It is reasonable to assume that the Board was generally aware of the various bank affiliations of the defendant trustees, but there is no indication that these conflicting interests were brought home to the relevant committees when they voted to approve particular transactions. Similarly, while plaintiffs have shown no active misrepresentation on defendants' part, they have established instances in which an interested trustee failed to alert the responsible officials to better terms known to be available elsewhere.

It is clear that all of the defendant trustees have, at one time or another, affirmatively approved self-dealing transactions. Most of these incidents were of relatively minor significance: one interested trustee would join a dozen disinterested fellow members of the Executive Committee in unanimously approving the opening of a bank account; two or three interested trustees would support a similarly large group in voting to give or renew the mortgage. Others cannot be so easily disregarded. Defendant Ferris' advice and vote in the relatively small Investment Committee to recommend approval of the investment contract with Ferris & Co. may have been crucial to that transaction.

Defendant Reed assumed principal responsibility for account levels between 1969 and 1971, during which period the Security checking account grew to more than a million dollars. And defendant Smith, in his capacity as President of Jefferson Federal, personally negotiated the interest rates on a $230,000 certificate account with the Hospital.

That the Hospital has suffered no measurable injury from many of these transactions—including the mortgage and the investment contract—and that the excessive deposits which were the real source of harm were caused primarily by the uniform failure to supervise rather than the occasional self-dealing vote are both facts that the Court must take into account in fashioning relief, but they do not alter the principle that the trustee of a charitable hospital should always avoid active participation in a transaction in which he or a corporation with which he is associated has a significant interest.

B. *The Financial Institutions.*

While it is thus established that the named trustees acted in breach of fiduciary duty, the institutional defendants are not liable simply because they benefited from those breaches. Under the prevailing rule of law, a bank or other financial institution is only liable for losses sustained by a trust by reason of its dealings with a trustee if the institution had actual or constructive knowledge that the transaction was in breach of the trustee's fiduciary duty. Anacostia Bank v. United States Fidelity & Guaranty Co., 73 App.D.C. 388, 119 F.2d 455 (1941); *cf.* Union Stock Yards Bank v. Gillespie, 137 U.S. 411, 416, 11 S.Ct. 118, 34 L.Ed. 724 (1890); 4 Scott on Trusts §§ 324 et seq. This principle applies to dealings with corporate fiduciaries as well as trustees, Restatement of Restitution § 138 (1937); 3 Fletcher Cyc. Corp. (Perm.Ed.Rev. 1965) § 1102, at 721, and to situations in which, as here, the alleged breach entails the maintenance of excessive demand depos-

its in the defendant bank. Blankenship v. Boyle, *supra*, 329 F.Supp. at 1101–1104 (D.D.C.1971).

 Actual knowledge of a breach of fiduciary duty can, of course, be inferred from the sheer size and inactivity of some accounts in question, the number and significance of interlocking relationships, and a history of questionable investment transactions with the fiduciary. Blankenship v. Boyle, *supra*, 329 F.Supp. at 1102 (D.D.C.1971). In addition, constructive knowledge may be found where an interlocking officer or director has actual knowledge of the excessive nature of the deposits and participates, on behalf of the bank, in the bank's decision to accept those deposits. *Compare* Bowen v. Mount Vernon Sav. Bank, 70 App.D.C. 273, 105 F.2d 796 (1939), *with* Arlington Brewing Co. v. Bluethenthal & Bickart, 36 App.D.C. 209 (1911).

 The defendant financial institutions claim that the Uniform Fiduciaries Act, D.C.Code § 21–1701 et seq., alters this rule in the District of Columbia by providing that banks may only be held liable for breaches of fiduciary duty of which they had actual knowledge. That Act, however, applies only to liability for "check transaction[s]," and the common law prevails in all areas where the Act does not expressly apply. Colby v. Riggs Nat.Bank, 67 App.D.C. 259, 92 F.2d 183 (1937). The maintenance of excessive deposits does not appear to fall within any of the Act's provisions, so the principles set forth above are controlling.

 Under those principles, the Court finds that the institutional de-

fendants are not liable for any loss of income that may have been suffered by the Hospital. Each bank and savings and loan association was aware only of its own accounts, and no single institution maintained Sibley deposits so large that it should have investigated the fidelity of the Hospital Board. Plaintiffs have failed to demonstrate that any of the transactions in question would have alerted a reasonable bank officer to breaches of fiduciary duty, so actual knowledge of such breaches cannot be found. Nor was there constructive knowledge, because the interlocking trustees were themselves ignorant—however wrongfully—of Ernst's imprudent investment policies. Only an agent's *actual* knowledge can be imputed to his principal. *See* Bowen v. Mount Vernon Sav. Bank, *supra*, 70 App.D.C. at 275, 105 F.2d 796.

IV. *Relief.*

The foregoing constitutes the Court's findings of fact and conclusions of law. Many of the parties' proposed findings have been incorporated into this analysis, and others listed in the margin [4] are hereby adopted by the Court. For the reasons set forth above, the Court has dismissed the amended complaint as to all of the defendant financial institutions, rejected all conspiracy claims, and refused to cancel the disputed mortgage. It must now consider the appropriate relief in light of its finding that the defendant trustees have breached their fiduciary duties of care and loyalty to the Hospital.

In addition to a declaration defining the duties and obligations of the trustees

4. The Court adopts plaintiffs' proposed findings numbered 2–7, 9, 17, 19, 24 (second sentence and table only), 35–36, 37 (first sentence only), 38–41, 44, 46–47, 49–52, 56–58, 63 (first sentence only), 64–65, 70 (first two sentences only), 75 (as amended) and 76–77; defendants' joint proposed findings numbered I–1(C) and (D); defendant Reed's proposed findings numbered 1–3, 4 (first sentence only), 12, 17, 19 (all but last sentence), and 20 (first sentence); defendant Mc-

Lachlen's proposed findings numbered 1, 6, and 16; defendant Smith's proposed findings numbered 1, 4, 6, and 12–13; defendant Jones' proposed findings numbered 1 (first sentence only), 2–5, 7 and 18; defendant Ferris' proposed findings numbered 1, 3–4, 6, 7 (all but last sentence), 8 (all but last sentence), 15 and 19. All other proposed findings were considered and omitted as cumulative, irrelevant to the results reached, or unsupported by the evidence.

in the disputed area of the Hospital's fiscal management, plaintiffs press for injunctive relief. Among other things, they urge that defendant trustees be removed and disqualified, that the Hospital be barred from transacting business with any firm if an officer, director, partner or substantial shareholder of that firm is a Hospital trustee, that an accounting be ordered, and that damages be assessed against the defendant trustees. In short, plaintiffs approach this matter as though each trustee of the Hospital were individually responsible for an abuse of fiduciary duty under an express trust which has made the Hospital's patients beneficiaries. Were such the case, application of very strict sanctions would be necessary. However, the trustees here stand in a different status, as the Court's analysis shows, and the proof does not in any way necessitate sanctions as harsh as those suggested.

■ The function of equity is not to punish but merely to take such action as the Court in its discretion deems necessary to prevent the recurrence of improper conduct. Hartford-Empire Co. v. United States, 323 U.S. 386, 409, 65 S.Ct. 373, 89 L.Ed. 322 (1945); Hecht Co. v. Bowles, 321 U.S. 321, 329–330, 64 S.Ct. 587, 88 L.Ed. 754 (1944); Swift & Co. v. United States, 276 U.S. 311, 326, 48 S.Ct. 311, 72 L.Ed. 587 (1928). Where voluntary action has been taken in good faith to minimize such recurrence, even though under the pressure of litigation, this is a factor which the Court can take into account in formulating relief. United States v. Oregon Medical Society, 343 U.S. 326, 334, 72 S.Ct. 690, 96 L.Ed. 978 (1952); Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 421, 65 S.Ct. 1242, 89 L.Ed. 1705 (1945).

In attempting to balance the equities under the circumstances shown by the record, there are a number of factors which lead the Court to feel that intervention by injunction should be limited.

*See* United States v. W. T. Grant Co., 345 U.S. 629, 632–633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). First, the defendant trustees in this case constitute but a small minority of the full Sibley Board. Yet, in several respects, the responsibility for past failures adequately to supervise the handling of Hospital funds rests equally on all Board members. Second, it is clear that the practices criticized by plaintiffs have, to a considerable extent, been corrected and that the employees and trustees who were principally responsible for lax handling of funds have died or have been dismissed. Third, there is no indication that any of the named trustees were involved in fraudulent practices or profited personally by lapses in proper fiscal supervision, and, indeed, the overall operation of the Hospital in terms of low costs, efficient services and quality patient care has been superior. Finally, this case is in a sense one of first impression, since it brings into judicial focus for the first time in this jurisdiction the nature and scope of trustee obligations in a non-profit, non-member charitable institution incorporated under D.C.Code § 29–1001 et seq.

■ The Court is well aware that it must take proper steps to insure a clean break between the past and the future. Personnel changes and a recent greater awareness of past laxity are encouraging, as is the addition of Article XXVIII to the Hospital's by-laws, but good intentions expressed post-litem must be accompanied by concrete action. Accordingly, it is desirable to require by injunction that the appropriate committees and officers of the Hospital present to the full Board a written policy statement governing investments and the use of idle cash in the Hospital's bank accounts and other funds, and establish a procedure for the periodic reexamination of existing investments and other financial arrangements to insure compliance with Board policies. No existing financial relationships should be continued unless consistent with established policy

and found by disinterested members of the Board to be in the Hospital's best interests. In addition, each trustee should fully disclose his affiliation with banks, savings and loan associations and investment firms now doing business with the Hospital.

 Removal of the defendant trustees from the Sibley Board would be unduly harsh, and this will not be ordered. These trustees are now completing long years of service and they will soon become less active in the day-to-day affairs of the Hospital because of age or illness. It would unduly disrupt the affairs of the Hospital abrupty to terminate their relationship with that institution. Others must soon take over their roles in carrying forward the Hospital's affairs, and it is therefore unnecessary to interfere by order of removal or disqualification with a transition that is necessarily already taking place due to other immutable factors.

The management of a non-profit charitable hospital imposes a severe obligation upon its trustees. A hospital such as Sibley is not closely regulated by any public authority, it has no responsibility to file financial reports, and its Board is self-perpetuating. The interests of its patients are funnelled primarily through large group insurers who pay the patients' bills, and the patients lack meaningful participation in the Hospital's affairs. It is obvious that, in due course, new trustees must come to the Board of this Hospital, some of whom will be affiliated with banks, savings and loan associations and other financial institutions. The tendency of representatives of such institutions is often to seek business in return for advice and assistance rendered as trustees. It must be made absolutely clear that Board membership carries no right to preferential treatment in the placement or handling of the Hospital's investments and business accounts. The Hospital would be well advised to restrict membership on its Board to the representatives of financial institutions which have no substantial business relationship with the Hospital. The best way to avoid potential conflicts of interest and to be assured of objective advice is to avoid the possibility of such conflicts at the time new trustees are selected.

As an additional safeguard, the Court will require that each newly-elected trustee read this Opinion and the attached Order. Compliance with this requirement must appear in a document signed by the new trustee or in the minutes of the Sibley Board. In view of the circumstances disclosed by the record it will be desirable, in addition, to require public disclosure which will further insure that the Board's recently-avowed good intentions are faithfully carried out. To this end, the Court will direct that prior to each meeting of the full Board the members of the Board shall receive, at least one week in advance, a formal written statement prepared by the Hospital's Treasurer or Comptroller disclosing in detail the full extent of all business done by the Hospital since the last Board meeting with any bank, savings and loan association, investment service or other financial institution with which any trustee or officer of the Hospital is affiliated as a trustee, director, principal officer, partner, general manager or substantial shareholder. Moreover, all such dealings shall be summarized by the Hospital's auditors in their annual audit and a copy of the annual audit shall be made available on request for inspection by any patient of the Hospital at the Hospital's offices during business hours. Such arrangements should continue for a period of five years.

For the reasons set forth in its Memorandum and Order of November 30, 1973, and at various pretrial hearings, the Court declines to award damages incident to the injunctive and declaratory relief appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure or to reconsider the denial of certifica-

tion under Rule 23(b)(1) and (3). No accounting will be ordered, and all other relief requested by plaintiffs is denied. Since plaintiffs do not press their claim for attorneys' fees at this time, the Court will postpone action on that issue until such time as it is raised and briefed by the parties.

## ORDER

This action came on for trial before the Court and the Court having considered the briefs, arguments and evidence presented by all parties and having set forth its findings of fact and conclusions of law in a Memorandum Opinion filed herewith, it is hereby

Declared that each director or trustee of a charitable hospital organized under the Non-Profit Corporation Act of the District of Columbia, D.C.Code § 29–1001 et seq., has a continuing fiduciary duty of loyalty and care in the management of the hospital's fiscal and investment affairs and acts in violation of that duty if:

(1) he fails, while assigned to a particular committee of the Board having stated financial or investment responsibilities under the by-laws of the corporation, to use diligence in supervising and periodically inquiring into the actions of those officers, employees and outside experts to whom any duty to make day-to-day financial or investment decisions within such committee's responsibility has been assigned or delegated; or

(2) he knowingly permits the hospital to enter into a business transaction with himself or with any corporation, partnership or association in which he holds a position as trustee, director, partner, general manager, principal officer or substantial shareholder without previously having informed all persons charged with approving that transaction of his interest or position and of any significant facts known to him indicat-

ing that the transaction might not be in the best interests of the hospital; or

(3) he actively participates in, except as required by the preceding paragraph, or votes in favor of a decision by the board or any committee or subcommittee thereof to transact business with himself or with any corporation, partnership or association in which he holds a position as trustee, director, partner, general manager, principal officer, or substantial shareholder; or

(4) he fails to perform his duties honestly, in good faith, and with reasonable diligence and care; and it is hereby

Ordered that the appropriate officers and/or trustee committees of Sibley Memorial Hospital shall, prior to the next regularly scheduled meeting of the full Board of Trustees, draft and submit to the full Board, and the Board shall modify as it deems appropriate and adopt at said meeting, a written policy statement governing the utilization and investment of the Hospital's liquid assets, including cash on hand, savings and checking accounts, certificates of deposit, Treasury bonds, and investment securities; and it is further

Ordered that the Board and its appropriate committees shall, promptly after adoption of said policy statement and periodically thereafter, review all of the Hospital's liquid assets to insure that they conform to the guidelines set forth in said policy statement; and it is further

Ordered that each trustee of Sibley Memorial Hospital shall disclose to the full Board of Trustees prior to its next regularly scheduled meeting, in writing, his or her affiliations, if any, with any bank, savings and loan association, investment firm or other financial institution presently doing business with the Hospital and shall thereafter quarterly amend such writing to reflect any changes; and it is further

Ordered that the Treasurer of Sibley Memorial Hospital shall, at least one week prior to each regularly scheduled meeting of the Board of Trustees for a period of five years from the date of this Order, prepare and transmit to each trustee a written statement setting forth in detail all business conducted since the last Board meeting between the Hospital and any bank, savings and loan association, investment firm or other financial institution with which any Sibley officer or trustee is affiliated as a trustee, director, partner, general manager, principal officer, or substantial shareholder; and it is further

Ordered that the auditors of Sibley Memorial Hospital shall, for a period of five years from the date of this Order, incorporate into each annual audit a written summary of all business conducted during the preceding fiscal year between the Hospital and any bank, savings and loan association, investment firm or other financial institution with which any Sibley officer or trustee is affiliated as a trustee, director, partner, general manager, principal officer or substantial stockholder, and shall make a copy of said audit available on request for inspection by any patient of the Hospital at the Hospital's offices during business hours; and it is further

Ordered that each present trustee of Sibley Memorial Hospital and each future trustee selected during the next five years shall, within two weeks of this Order or promptly after election to the Board, read this Order and the attached Memorandum Opinion and shall signify in writing or by notation in the minutes of a Board meeting that he or she has done so; and it is further

Ordered that plaintiffs' request for reconsideration of the Court's refusal to certify their class under Rule 23(b)(1) or (3) is denied; and it is further

Ordered that all other relief requested by plaintiffs is denied; and it is further

Ordered that plaintiffs shall have their costs, but only for the successful phases of this action.