The UNITED STATES as Parens Patriae by its Attorney General et al., Plaintiffs,

v.

MOUNT VERNON MORTGAGE CORPORATION et al., Defendants.

Civ. A. No. 4088–51.

United States District Court, District of Columbia.

Findings of Fact Oct. 22, 1954.

Leo A. Rover, U. S. Atty., Rufus Stetson, Jr., Asst. U. S. Atty., George A. Fruit, Attorney, Dept. of Justice, Washington, D. C., for plaintiffs.

Brandenburg & Brandenburg, Louis M. Denit, Washington, D. C., for Mount Vernon Mortgage Corp., Robert T. Highfield, E. Flavelle Koss and L. Harold Sothoron.

Magee, Bulow & Andersen, Warren E. Magee, William J. Bulow, Jr., Washington, D. C., for defendants National

Home Library Foundation and Fannie Sessions Mittell.

MATTHEWS, District Judge.

### Findings of Fact

1. This suit was brought by the United States as *parens patriae* in behalf of the unknown beneficiaries of the National Home Library Foundation to cancel transfers its trustees made of 1600 shares of Longfellow Building Corporation stock. The return to the Foundation is sought of 1500 shares from the defendant, Mount Vernon Mortgage Corporation, and 100 shares from the defendant, Fannie Sessions Mittell.

2. The National Home Library Foundation (hereinafter called the Foundation) is a charitable corporation organized in 1932 under the District of Columbia law relating to ˙charitable, educational, religious and missionary societies. Its charter states:

> "The particular business and objects of this corporation are to promote and inculcate in more people the desire to read good literature; to make home libraries more easily available to greater numbers of our population; to urge the reading of good literature through printed announcements, radio broadcasts and newspapers; and to these ends to provide for the delivery and holding of lectures, exhibits, public meetings, classes and conferences, calculated to advance the cause of education and promote the general culture of the nation; and for these purposes to do and perform every lawful act and thing necessary and expedient to be done or performed and which may be convenient or advantageous for the efficient conduct of its affairs; and to have and exercise all powers conferred by the laws of the District of Columbia upon corporations organized under subchapter 3 (Code of March 4, 1929, Title 5, Chapter 5 of the incorporation laws of the District of Columbia." [1]

3. The Foundation by the spring of 1938 had an Advisory Board of sixty distinguished men and women representative of American culture and education. At that time the Foundation was a pioneer in publishing small, cheap, pocket editions of literary masterpieces. It provided these books free or at cost [2] to Army posts, lighthouses, ships, prisons, hospitals, libraries and universities. It also carried out a program to improve cultural conditions in rural sections in cooperation with farm bureau federations, churches, schools, and rural publications, and through the Carnegie Endowment for International Peace sent editions of English classics to interested folk throughout the world.[3] For a year it conducted an educational radio program. The "Foundation seemed to have a reasonable chance of real success" until its work was interrupted by the Pearl Harbor Incident.[4]

4. The Longfellow Building Corporation—the corporation issuing the stock involved in this suit—was organized in 1939 under the laws of Delaware, and began doing business in the District of Columbia. Its principal or only asset is a large, modern, twelve story office building in a desirable business area in Washington, D. C., being located on the northeast corner of Connecticut and Rhode Island Avenues, Northwest, about a block from the Mayflower Hotel and opposite the statue of the poet, Longfellow. From the time of its completion early in 1941 the building has been continuously rented to the United States ex-

1. The reference to subchapter 3 pertains to Chapter 854, 56th Congress, Second Session, 1901, 31 Stat. 1283, presently Secs. 29–601 to 606 of the District of Columbia Code of 1951.

2. The Foundation Minutes of February 12, 1932, indicate that books sold were to be at cost of production and distribution.

3. Pl.'s Ex. 28 and 29.

4. Record, p. 222.

cept the first floor which since its release by the Government has been used for stores.

5. The defendant, Mount Vernon Mortgage Corporation (hereinafter called Mt. Vernon), is a corporation organized under the laws of Delaware. It began operating in the District of Columbia in 1938, and is engaged in the real estate, investment and insurance business.

6. The defendant, Fannie Sessions Mittell, now Mrs. Ludwig Caminita (hereinafter called Mrs. Mittell), became secretary of the Foundation on February 19, 1940 and a trustee of the Foundation on April 1, 1940. She became second vice-president and a director of Longfellow Building Corporation (hereinafter called Longfellow) on July 22, 1942, and has since continuously held such positions.

7. The defendant, Robert T. Highfield (hereinafter called Mr. Highfield), was a trustee of the Foundation from April 1, 1940, until March 19, 1941. He has been a director of Mt. Vernon since March 5, 1938, its secretary-treasurer from March 5, 1938, until December, 1944, and its president and treasurer since December, 1944. He is and has been since April 2, 1940, a director and treasurer of Longfellow. He became president thereof in July, 1942 and still holds that office.

8. The defendant, L. Harold Sothoron (hereinafter called Mr. Sothoron), was a trustee of the Foundation from April 1, 1940, until March 19, 1941. He is and has been a director and the general counsel of Mt. Vernon since 1938 and is also a vice-president of it at the present time. He has been a director and vice-president of Longfellow since 1940 and holds such positions at the present time.

9. The defendant, E. Flavelle Koss (hereinafter called Mr. Koss), has been a director and officer of Mt. Vernon since 1938, and at present is a director thereof and its secretary and vice-president. He is and has been a director and assistant secretary and assistant treasurer of Longfellow since April, 1940.

10. Sherman F. Mittell (hereinafter called Mr. Mittell) is the deceased husband of the defendant, Mrs. Mittell. He was the principal founder of the Foundation and of Longfellow, and was president of each from its inception until his death July 12, 1942.

11. Sidney Acey Carraway (hereinafter called Mr. Carraway) was elected a trustee and president of the Foundation in August, 1942, to fill the vacancy created by the death of Mr. Mittell.

12. Robert C. Craig (hereinafter called Mr. Craig) was elected a trustee of the Foundation in July, 1940.

13. In December, 1943, there were three trustees of the Foundation, Mrs. Mittell, Mr. Carraway and Mr. Craig. The last meeting of the trustees was on December 9, 1943. Each of them from that day forward considered that the Foundation had ceased to exist and that their trusteeship had ended. The Foundation's charter declares the term of its existence as perpetual, however, and no dissolution has been judicially decreed. Of the three trustees, only Mrs. Mittell is a party to this action. The other two were witnesses at the trial and are informed as to the issues involved.

14. The early history of the Longfellow building is tied in with the acquaintanceship of Mr. Mittell and Mr. Craig. In 1938 and 1939 Mr. Craig was deputy administrator of the Rural Electrification Administration. He was charged with locating office quarters for that administration. After considerable frustration in that task he suggested to Mr. Mittell the idea of constructing an office building to be financed primarily by a first trust loan from Reconstruction Finance Corporation. Neither Mr. Mittell nor the Foundation had any funds. Nevertheless, Mr. Mittell set out to bring the idea to realization. Mr. Craig was not then a trustee of the Foundation.

15. To Mr. Mittell the work of the Foundation "was a great crusade." [5] He planned the Longfellow building as a source of income for the Foundation. It was his view that from its Longfellow stock the Foundation "should be able in future years to derive a material income available for use in carrying forward the Foundation's purposes and program." [6] The plan as of April 1940 was for the Foundation to "own 864 shares of stock of the building corporation", Mt. Vernon to "receive 667 shares out of the 2000 shares of stock of the building corporation" and "other parties who * * participated in the necessary work" to "receive in the aggregate 469 shares." [7]

16. The Foundation, Mr. Highfield and Mr. Sothoron, on April 2, 1940, ratified said plan and authorized the officers of the Foundation to execute the same.

17. The financing of the Longfellow building was arranged as follows: The Reconstruction Finance Corporation gave a commitment to Longfellow to make a first trust loan of $1,500,000 toward the acquisition of the land and the erection of the building, subject to the conditions among others that Longfellow have cash capital of $150,000 and that a guaranty be given by a financially responsible party to furnish such sums, if any, as might be needed over and above the aforementioned $1,650,000 to complete the building and discharge the obligations of Longfellow until 80 per centum of the office space should be leased to tenants satisfactory to the Reconstruction Finance Corporation. This guaranty was given by Mt. Vernon pursuant to an agreement between Mt. Vernon, Longfellow and the Foundation whereby Mt. Vernon for any such funds it might advance would receive a note or notes from Longfellow carrying 6% interest to be secured by a second deed of trust on the building; Mt. Vernon would pay to the Foundation $5,000; the Foundation would transfer to Mt. Vernon 667 shares of Longfellow stock; Mt. Vernon would have the right to place all insurance and be employed to operate and manage the building for a management fee of $4,500 or $9,000 per year for the first 5 years, depending upon whether the lease should be on a net or gross basis. In April 1940 Mt. Vernon acquired said 667 shares of Longfellow stock. During the course of construction of the Longfellow building the cash advances (loans) made by Mt. Vernon under said agreement totalled $139,032.21.

18. The source of Longfellow's cash capital of $150,000 (referred to in the preceding paragraph) is as follows: Longfellow borrowed from the building contractor, John McShain, Inc., $140,000 and paid said sum to the Foundation for services rendered. [8] The Foundation then paid to Longfellow for 300 shares of Longfellow stock the said $140,000 plus $10,000 additional—a total of $150,000. Said $10,000 consisted of a loan of $5,000 from Mt. Vernon and the $5,000 which Mt. Vernon paid the Foundation under the guaranty agreement set out in the preceding paragraph. Out of proceeds from the first trust John McShain, Inc. was eventually repaid the $140,000 by Longfellow.

19. The Longfellow building was completed February 3, 1941, and the Government began occupying all of the approximately 155,400 net square feet of floor space. The annual rent was $203,634.48 payable $16,969.45 per month. The first lease ran from February 3, 1941, to June 30, 1942, with option in the lessee to renew from year to year until June 30, 1945, subject to adjustment of rental terms at each renewal period according to a rent formula estab-

---

5. Record, p. 222.

6. Pl.'s Ex. 1, Minutes of April 2, 1940.

7. Ibid.

8. The services rendered to Longfellow by the Foundation for said $140,000 are not clearly spelled out but Mr. Sherman F. Mittell as an officer of the Foundation was engaged in laborious activities over an extended period of time concerning the planning, financing and promotion of the Longfellow building project.

lished by the Reconstruction Finance Corporation Mortgage Company in an agreement with Longfellow. During any renewal period the Government upon written notice might terminate the lease effective at the end of the month following the month in which such notice is given.

20. Pursuant to the plan for the Foundation to own 864 shares of Longfellow stock, the Foundation acquired exactly that number exclusive of the 667 shares transferred to Mt. Vernon under the guaranty agreement and 100 shares transferred to a lawyer who had worked on the building project. The 864 shares were acquired by a series of transactions. The Foundation paid Longfellow as already stated $150,000 for *300 shares* or $500 per share. An option to buy for $250,000 the key portion of the building site was obtained by the Foundation in 1939 and in 1940 it conveyed said portion to Longfellow for the same cash consideration plus *360 shares* of Longfellow stock (at an estimated value of $180,000 or $500 per share). From John McShain, Inc., the Foundation acquired *174 shares*. Mr. Roy S. Thurman and Mr. Mittell transferred to the Foundation *30 shares* (or 15 each). The shares hereinbefore italicized total 864 but this number was reduced to 839 shares when the Foundation on January 22, 1941 disposed of 25 shares.[9]

21. The said 839 shares represent the Longfellow stock owned by the Foundation as of January 14, 1942. On that date, however, a resolution was passed by the Foundation authorizing the borrowing from Mt. Vernon of $12,000 at 6% interest and the pledging of 931 shares to secure the loan (92 more shares than the 839 owned by the Foundation). Mr. Mittell in his own right owned one certificate for 3 shares and one certificate for 91 shares—or 94 shares in all. On January 15, 1942—the date the loan was made—the Foundation's 839 shares and Mr. Mittell's 94 shares (a total of 933 shares) were put up as collateral for the loan.[10]

22. Mr. Mittell transferred his 94 shares to the Foundation only for use by it as collateral for a loan, and he did not intend to part with his ownership of said shares.[11]

23. In late December 1942 following the death of Mr. Mittell in July of that year, Mr. Highfield initiated negotiations with Mrs. Mittell for the sale to Mt. Vernon of the 933 shares of Longfellow stock which the Foundation had pledged for the $12,000 loan from Mt. Vernon. At that time Mrs. Mittell was emotionally disturbed, troubled and in poor health, and wanted to pay the Foundation's debts and wind up its affairs. Mr. Highfield was well aware of these circumstances.

24. The defendant, Mr. Highfield, was the agent of the defendant, Mt. Vernon, and its other directors to conduct the negotiations with the Foundation for the disposition of the 933 shares of Longfellow stock referred to hereinabove.

9. Stock book references to the shares mentioned in paragraph 20 are as follows: Pl.'s Ex. 2A, Certfs. 22, 8, 9, 10, 15, 19 and 16 and reverse side of each certificate. Pl.'s Ex. 2B, Certfs. 27 & 28 and Pl.'s Ex. 2A, Certfs. 25, 18 and 6 and reverse side of each. The shares Thurman transferred originally belonged to Wm. Lescaze, the architect of the building, as certificate 18 which was replaced by certificate 40.

10. The certificate for 3 shares was issued to Mr. Mittell in July, 1939. Pl.'s Ex. 2A, Cert. 1. The certificate for 91 shares was issued to him in April 1940. Pl.'s Ex. 2A, Cert. 20. But these 91 shares came out of original certificate 3 issued in July 1939 as indicated on the reverse side of said certificate 3. Mr. Mittell signed blank stock powers and attached one to each of his certificates which at the time of the loan were cancelled and certificate 41 was issued to the Foundation in lieu of original certificate 1 and certificate 42 in lieu of certificate 20.

11. See Mr. Mittell's statement to Mr. Highfield at the time of the transfer. Record, p. 193. It is admissible under the verbal act doctrine, Wigmore, 3 Ed., Secs. 1772–1777, to show Mr. Mittell intended to loan said shares to the Foundation.

25. At the time of said negotiations the trustees of the Foundation were Mrs. Mittell, Mr. Craig and Mr. Carraway. They knew very little about the financial affairs of Longfellow. Mrs. Mittell had been a member of the Board of Directors of Longfellow and an officer thereof for about six months but had attended no meetings of the Board during that period. She had seen financial reports of Longfellow but did not pay any particular attention to them as she was concerned with other problems. She did not know what the expenses or profits were in connection with the operation of the building during 1942. Mr. Craig and Mr. Carraway were likewise uninformed except that Mr. Craig knew about the original financing of the building and the rent agreement. The trustees were unaware of the book value of the Longfellow stock, and made no effort to ascertain it. The number of shares owned by the Foundation in relation to the total shares outstanding was unknown to the trustees as was the fact that the Foundation was the controlling stockholder. They sought no independent advice as to the market value of the stock or the other assets of the Foundation. They made no effort to learn the value of the Longfellow building or Longfellow's equity therein. They did not try to sell the stock to anyone other than Mt. Vernon.

26. On January 19, 1943 Mt. Vernon purchased 833 shares of Longfellow stock from the Foundation for the sum of $27,905.50 or $33.50 per share. This sale was consummated by the payment of $15,163.50, being the balance of the said purchase price after deducting a transfer tax, the $12,000 loan and interest thereon amounting to $728, being the loan referred to in paragraph 21. Mt. Vernon still owns said 833 shares. The purchase of these 833 shares by Mt. Vernon gave Mt. Vernon control of Longfellow since Mt. Vernon thereupon became the owner of 1500 of the 2000 authorized shares of Longfellow stock.

27. Mr. Highfield and Mr. Sothoron advised Mrs. Mittell in January 1943 that she should take 100 shares of Longfellow stock from the 933 shares the Foundation pledged to secure the loan from Mt. Vernon, and that Mt. Vernon was purchasing 833 shares at $33.50 per share. Until this time Mrs. Mittell had believed Mt. Vernon was going to purchase 933 shares from the Foundation at a price sufficient to pay the Foundation's debts. Mr. Highfield explained to Mrs. Mittell that 94 of the shares pledged for the loan from Mt. Vernon belonged to her late husband, Mr. Mittell, and that 6 shares were being added to the 94 to make it an even hundred so that Mr. Mittell's son—then a year old— "will have this hundred shares in his father's building."[12]

28. Despite the events related in the preceding paragraph, on February 19, 1943 said 100 shares were transferred by the Foundation to Mrs. Mittell purportedly in part payment of an alleged loan in the amount of $12,000 from her to the Foundation. The evidence does not establish the existence of such a loan. Mrs. Mittell still owns said 100 shares.

29. In early 1943 when the Foundation's stock was sold, the signs of the times presaged a successful future for the Longfellow building. During the depression years of the thirties building construction declined and during World War II restrictions on private building projects were imposed. There was a marked shortage early in 1943 of office space in Washington and a pressing need for housing for agencies of the federal government and otherwise. There was an upswing in the real estate market.

30. Taking into consideration only those factors which a purchaser under fair market conditions would consider as of January 15–19, 1943, the fair market value of the Longfellow building was then $2,000,000. At that time, however, the property was encumbered by the first and second trusts to which reference has already been made.[13] The books of

12. Record, p. 55.

13. These trusts had been reduced by monthly payments.

Longfellow as of December 31, 1942, reflected a net worth, or capital and surplus of $545,712.90.

31. The total outstanding number of shares of Longfellow as of December 31, 1942, was 2000. The book value at that time was at least $176 per share.

32. On January 19, 1943 prior to the sale of 833 shares of Longfellow stock to Mt. Vernon, the Foundation owned 839 shares of Longfellow's outstanding stock and was the majority stockholder in Longfellow.

33. On January 15–19, 1943, the fair market value of 833 shares of stock of Longfellow was $123 per share or $102,-459. The fair market value of 6 shares at said time and in February, 1943, was $123 per share or $738.

34. Mt. Vernon, Mrs. Mittell, Mr. Highfield, Mr. Sothoron, and Mr. Koss knew, or should have known, that the fair market value of Longfellow stock on said dates was far greater than $33.50 per share, and that the then book value of said stock was at least $176 per share.

35. Mr. Highfield and his wife and Mr. Sothoron during the periods covered by this action were intimate friends of Mrs. Mittell. Mr. Highfield and Mr. Sothoron acted as advisers to Mrs. Mittell, in her personal affairs and in the affairs of the Foundation from July, 1942, through February 19, 1943 and thereafter.

36. Between July 12, 1942 and February 19, 1943, none of the creditors of the Foundation was pressing for payment. The principal creditors at that time were the H. Wolff Book Manufacturing Company, Inc. and Mt. Vernon. The former offered to write off the indebtedness as a bad debt and the latter to extend time for payment. Mrs. Mittell disclosed this to Mr. Highfield but failed to disclose it to Mr. Carraway or Mr. Craig, although Mr. Highfield told Mr. Craig that Mt. Vernon would extend the time for repayment of the $12,000 loan.

37. Mr. Carraway and Mr. Craig took little active part in the management or purported liquidation of the Foundation, leaving most such matters to Mrs. Mittell.

38. Mr. Carraway took no part in the disposition of 933 shares of Longfellow stock by the Foundation in early 1943 save acquiescence in and ratification of such action.

39. Mr. Carraway and Mr. Craig were motivated by sympathy and friendship for Mrs. Mittell when they ratified the transfer to her in 1943 of Longfellow stock, and by said sentiments and their desire to aid her in ridding herself of the Foundation and its debts when they authorized in 1943 the sale to Mt. Vernon of Longfellow stock.

40. The transactions whereby the Foundation's 839 shares of Longfellow stock were disposed of were not conducted at "arm's length".

41. The trustees of the Foundation in selling and disposing of the Foundation's shares of Longfellow stock in early 1943 acted contrary to the interests and purposes of the Foundation and its unknown beneficiaries.

42. Mrs. Mittell, aided and abetted by Mr. Craig and Mr. Carraway, also disposed of the assets of the Foundation, other than the Longfellow stock, and dealt with the proceeds therefrom in a manner inconsistent with the prudence and propriety required of her as a trustee.

43. The transfer by Mrs. Mittell, Mr. Carraway and Mr. Craig of Longfellow stock to Mrs. Mittell in February, 1943, was without consideration.

44. The transfer by Mrs. Mittell, Mr. Carraway and Mr. Craig of the 833 shares of Longfellow stock to Mt. Vernon in January, 1943, was for a grossly inadequate consideration.

45. Since Mt. Vernon acquired the 833 shares of stock referred to in paragraph 26 it has received in dividends upon said stock $174,930.

46. Since Mrs. Mittell acquired the 100 shares of stock referred to in paragraphs 27 and 28 she has received in

dividends upon said stock $21,000 or $19,740 upon the 94 shares which belonged to her deceased husband and $1,-260 upon the 6 shares belonging to the Foundation.

47. On May 3, 1950, Abe Lincoln Mahony filed in this court Civil Action No. 1979–50 against the Foundation, Longfellow, Mt. Vernon, Mr. Highfield, Mr. Sothoron, George Morris Fay, United States Attorney, and others. The action was dismissed by the court. The defendants herein assert that the subject matter of this action is *res judicata* by reason of Civil Action No. 1979–50.

48. The evidence does not sustain the defendants' claim of estoppel or laches.

Conclusions of Law.

1. The court has jurisdiction of this action.

■ 2. The National Home Library Foundation is a charitable corporation, presently existing in the District of Columbia, and the United States as *parens patriae* has authority to bring this action on behalf of the unknown beneficiaries of the Foundation.

3. The parties, issues, and disposition of the action in Mahony v. National Home Library Foundation, Civil Action 1979–50, were not such as to warrant application of the doctrine of *res judicata* to this action.

4. This action is not barred by estoppel, laches or any statute of limitations.

■ 5. There was no breach of trust in the transfer by the Foundation in April, 1940, of 667 shares of the common stock of the Longfellow Building Corporation to Mt. Vernon Mortgage Corporation, the consideration for said transfer being adequate.

■ 6. The trustees of the Foundation occupied a fiduciary relationship to it and its unknown beneficiaries. In negotiating the sale of 833 shares of the Longfellow stock in January, 1943, to Mt. Vernon Mortgage Corporation, said trustees failed to inform themselves of the value of the stock and failed to exercise the caution, care and skill which a man of ordinary prudence would exercise in dealing with his property. Due to their failure to perform their duties, the trustees transferred said 833 shares of stock for a shockingly inadequate consideration, and they thereby breached their trust.

7. The purchaser of the 833 shares of stock, Mt. Vernon Mortgage Corporation, had notice of the breach of trust, and took the stock with such notice.

8. The sale of 833 shares of the Longfellow stock by the Foundation to Mt. Vernon Mortgage Corporation must be set aside and said shares returned to the Foundation.

9. Mt. Vernon Mortgage Corporation must pay to the Foundation a sum equal to the amount of the dividends received by the corporation on the 833 shares less the amount paid by the corporation for the purchase of said shares.

■ 10. Of the 100 shares of Longfellow stock transferred by the trustees of the Foundation to Mrs. Mittell, 94 shares belonged to Mr. Mittell. The remaining 6 shares belonged to the Foundation and no consideration was given for them by Mrs. Mittell.

11. The transfer of 6 shares of the Longfellow stock by the Foundation to Mrs. Mittell must be set aside and said shares returned to the Foundation.

12. Mrs. Mittell must pay to the Foundation a sum equal to the amount of the dividends received by her on the 6 shares.

13. The trustees of the Foundation have impliedly renounced their offices. It is necessary for the court to appoint successor trustees, and the court will retain jurisdiction of this action for that purpose.

Counsel for plaintiff will submit a proposed judgment in accordance herewith.