James H. CHRISTIANSEN, et al., Appellants

v.

NATIONAL SAVINGS AND TRUST COMPANY, et al.

No. 80–2398.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 27, 1981.

Decided July 20, 1982.

Morton Liftin, Washington, D. C., with whom I. S. Weissbrodt and Marsha E. Swiss, Washington, D. C., were on the brief, for appellants.

Philip S. Neal, Washington, D. C., with whom Terry B. Dowd, Blue Cross and Blue Shield Ass'n, Peter J. Nickles, American Security and Trust Co., Howard W. Kacy and Nicholas D. Ward, Union Trust Co., Justin D. Bowersock, Charles S. Rhyne and William S. Rhyne, Nat. Sav. and Trust Co., Douglas R. Smith, Charles J. Steel and Jacqueline M. Saue, Group Hospitalization, and F. P. Rawlings, Jr., Washington, D. C., were on the brief, for appellees.

Before ROBINSON,* Chief Judge, Mac-KINNON, Circuit Judge, and NICHOLS,** Judge, United States Court of Claims.

Opinion for the Court filed by Judge NICHOLS.

NICHOLS, Judge:

This case comes before the court on appeal from an order entered by the Honorable Harold H. Greene, Judge of the United States District Court for the District of Columbia, who, in a memorandum order dated October 16, 1980, granted defendants' motion for summary judgment, denied plaintiffs' cross-motion for partial summary judgment, and dismissed plaintiffs' complaint.

Joseph and Ethel Blatt brought this class action in 1970 on behalf of all federal employees who were Blue Cross and Blue Shield subscribers. The named plaintiff, James H. Christiansen, was dismissed as a plaintiff in 1972 because he was never a subscriber under the Service Benefit Plan. Named as defendants are Blue Cross and Blue Shield Associations ("BCA" and "BSA", respectively, or "Associations"), nonprofit corporations which contracted with the Federal Government to provide health benefits to subscribing federal employees; Group Hospitalization, Inc. ("GHI"), a congressionally chartered nonprofit corporation which is a member of the BCA and also BCA's local representative for the Washington, D. C. area; National Savings & Trust Company, Union Trust Company, and American Security & Trust Company, all banks with certain deposit accounts in which subscription and investment income from the health benefits program have been held; and several officers or directors of the defendant banks who also served as members of the so-called Board of Trustees of GHI.

The plaintiffs' allegations concern the administration and operation of the Federal Employees Health Benefits Program established pursuant to 5 U.S.C. § 8901 et seq. These allegations are based on the premise that the relationships between the opposing parties under the Health Benefits Program are trust relationships establishing fiduciary duties owed to plaintiffs, which they can enforce. Plaintiffs allege that the amount of money that BCA, BSA, and GHI retained in their checking accounts in defendant banks, ostensibly to pay subscribers' hospital and medical claims, was too high, thus a breach of fiduciary duties. Plaintiffs also allege that the nonprofit status of the Associations and of GHI give rise to fiduciary duties on their part which run to their beneficiaries, i.e., the subscribers of the plan. Plaintiffs finally allege that members of the Board of Trustees of GHI, who served on the Board of Directors of defendant banks in which these checking accounts were maintained, or any of them, violated their fiduciary duties by virtue of these interlocking relationships.

_____

* Chief Judge Robinson did not participate in the disposition of this case.

** Judge Philip Nichols, Jr., of the United States Court of Claims, sitting by designation pursuant to 28 U.S.C. § 293(a).

In granting defendants' motion for summary judgment and dismissing plaintiffs' complaint, Judge Greene held that the terms of the contract with the government did not create a trust but rather a third party beneficiary relationship so far as plaintiffs were concerned, and that the status of the Associations and of GHI as nonprofit corporations did not give rise to fiduciary duties that could be enforced by plaintiffs. Although Judge Greene agreed with the result advocated by defendants, he refrained from basing his decision on theories advanced where defendants broadly contend that an insurance contract does not create a trust relationship. This argument is significant if only because it is here on appeal again advanced.

We conclude that the decision of the district court is correct for the reasons that follow, and must be affirmed.

### FACTS

An understanding of the mechanics of the Health Benefits Program is essential if we are properly to assess the arguments advanced by the parties in the context of this appeal.

In 1959 the United States Congress created a program to provide health benefits insurance coverage as a fringe benefit for federal civilian employees. The program was established under the Federal Employees Health Benefits Act, 5 U.S.C. § 8903(1). The Act authorized the Civil Service Commission ("Commission") to contract with private insurance carriers to provide health benefits similar to those offered by large private employers to their employees. Under the Act, federal employees would have a choice of plans—a nationwide indemnity benefit plan in which subscribers are reimbursed for specified medical expenses; a nationwide service benefit plan in which the insurance carrier pays for the enrollees' health expenses by making payments directly to physicians and hospitals, who, in turn, provide medical care for the subscribers; plans sponsored by employee organizations such as union plans underwritten by insurance companies; and plans involving comprehensive medical organizations, popularly called "health maintenance organizations." Each federal employee would always have a choice of at least the two national plans and, depending upon the employee's organization membership and place of residence, one or more additional plan. The United States would contribute part of the cost of the coverage, and the balance would be deducted from the employee's wages or salaries.

In 1960, pursuant to the Act, the Commission contracted with the Associations to provide the Government-wide Service Benefits Plan ("GWSBP" or the "Plan") for that year. This contract (the "Federal Contract"), initially effective for the period of July 1, 1960 to October 31, 1961, has been renewed annually thereafter subject to cancellation by the parties. The Associations represent an affiliation of 74 Blue Cross local plans and of 70 Blue Shield local plans. The Associations are not underwriters of health insurance. They act as trade associations providing certain central coordinating and administrative services for its members. In general, the Blue Cross plans underwrite the provision of hospital benefits while the Blue Shield plans underwrite the provision of benefits for physician care. GHI is the local Blue Cross plan for the District of Columbia.

Under the GWSBP the government and federal employees make payments to a fund called the "Employees Health Benefits Fund." The fund is administered by the Commission, payments are made from its assets to insurance carriers, and subscription income is routed to the Associations for the program's administrative expenses.

The Associations also contracted with GHI to establish an operations center for the GWSBP to perform certain central services, including recordkeeping and financial and computer services. Among other things, GHI agreed to receive the insurance premiums from the Commission, and to reimburse the local plans for claims which they had paid and for their administrative expenses. In connection with these functions, GHI maintained commercial checking

accounts in defendant banks in which it placed a portion of the subscriptions (premiums).

The Associations agreed on behalf of the local plans to provide health benefits specified in the Federal Contract to federal employees in consideration of the subscription income. Under the contract, this created an underwriting risk to the local plans "to provide health benefits * * * whether or not the sum of the charges [for benefits] exceeded the sum of the subscription income." (Stipulation of Facts ¶ 3.18.) To help offset this underwriting risk, a risk charge was assessed annually as provided in the Federal Contract and paid to the Associations. A risk charge is a normal charge in an experience rated group insurance contract. R. Eilers and R. Crowe, *Group Insurance Handbook*, p. 215 (1965). For example, the Government-wide Indemnity Benefit Plan underwritten by commercial insurers also provides for a risk charge.

As added protection against the risk that premiums might prove to be inadequate to cover all obligations, the Associations and the Commission agreed to establish a Special Reserve account. The Special Reserve consists of the excess amounts accumulated over the contract years of total subscription income received together with income earned on investments of Plan funds over expenditures of the Plan, (*e.g.*, claims paid and administrative costs). The Associations were permitted to use positive balances accumulated to the Special Reserve to defray deficits from prior years to the extent such amounts were available or to reduce subscribers' rates for ensuing years. In the event expenses incurred were greater than premium income for any given year, any loss not recovered from the Special Reserve in the contract year may be charged against the Special Reserve in future years if positive balances accrue. If the contract is terminated while the Special Reserve is negative, the plans would have to bear the resulting loss. The contract also provided that if it were cancelled, any positive balance left in the Special Reserve after all obligations incurred to the cancellation date were discharged, would be returned to the

Commission for deposit in the United States Treasury for the benefit of all insured employees.

Recognizing the fact that the Special Reserve would provide added protection, *i.e.*, in addition to the protection afforded by the risk charges, the contract provided that if the Special Reserve accumulated in excess of a specified percentage of premiums for any contract year, then the amount of the risk charge for the ensuing contract year would be renegotiated. Thus, the underwriting risk assumed by the plans was not eliminated although significant protections were afforded under the contract.

The Special Reserve is to be distinguished from another reserve account existing under the contract, the "incurred-but-unpaid claims" reserve. As the GWSBP operates, there is often a significant lag period between the time claims are incurred through the provision of medical services and the time such claims are submitted to the Associations for payment as well as a further lag period between the submission of claims and their actual payment. To deal with this problem, a portion of the funds received from the Commission is retained in the incurred-but-unpaid claims reserve with excesses, if any, going to the Special Reserve.

The Federal Contract initially provided that the Associations should invest the Special Reserve and credit the earnings to it, but investment of incurred-but-unpaid claims reserve funds was not addressed in the original contract. On July 5, 1962, the Commission and the Associations agreed to amend the contract and provided that "[t]he corporations shall invest and reinvest all funds on hand which in the judgment of the corporations are in excess of funds needed to discharge promptly the obligations incurred under this contract." (Stipulation of Facts ¶ 3.26.) The Commission and the Associations further agreed that investment income earned on the incurred-but-unpaid reserve would also be credited to the Special Reserve. These changes were made effective retroactive to 1960.

524

The Associations were to exercise their judgment in determining the amount of funds required to be held on hand to discharge current obligations and of the amounts to be invested. At the outset of the GWSBP, the Associations determined and subsequently directed GHI to maintain three-quarters of one month's premiums to discharge current obligations; the following year the cash to be retained was reduced to one-half of one month's premiums. We use the term "invest" to denote any use of the funds that generated income. Funds required to be retained on hand were in checking accounts which, as everyone knows, paid no interest until recently.

In 1974, the Commission audited certain aspects of the Federal Contract and questioned the requirement that one-half of one month's premiums be kept on hand to discharge current obligations. The Commission suggested that the Associations look at experience factors and minimum balances in establishing cash balances. Subsequently, the one-half of one month's premiums requirement was removed and the agreement between the Associations and GHI was amended to require GHI to "make such recommendations [to the Associations] in a manner to insure that the operations center will retain in cash at all times only sufficient program funds to meet promptly the operations center's current obligations under the Agreement." (Stipulation of Facts ¶ 3.31.) It also appears that GHI was given significant investment responsibilities of program funds. The parties dispute the amount of control GHI retained over cash management policies of the funds it received under the GWSBP. Petitioners contend that GHI, as agent for the Associations, was responsible for management decisions as to the level of cash balances to be held by GHI, while the respondent Associations argue that they did not relinquish their contractual duty to determine and invest funds which in their judgment were in excess of those needed to discharge current obligations. The trial court decided, and we agree, that this dispute need not be resolved by the court in order to dispose of the issues raised before us.

I

Before we address the merits of this case, we must raise sua sponte, a threshold matter. All federal judges are eligible to elect coverage under one of the plans just as are executive branch employees, and, like them, to change plans during "open seasons" provided for that purpose. We believe that normally more elect Blue Cross/Blue Shield than any other plan. Since this case involved a determination of whether a fiduciary duty is owed to persons insured under a federal employee group health insurance program, it raises the possibility that federal judges who are or who might be insured under the GWSBP would be disqualified from hearing and deciding this case. This matter was not briefed by either side here on appeal, nor does it appear to have been raised at the trial court level. We raise it here because the federal statute governing disqualification is self-enforcing. *Davis v. Board of School Commissioners of Mobile County*, 517 F.2d 1044, 1051, *reh. denied*, 521 F.2d 814 (5th Cir. 1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976).

There appears to be some uncertainty among the circuits and other federal courts as to whether 28 U.S.C. § 455 (1970), unamended, is the judicial disqualification statute that would apply to cases filed before December 5, 1974, the effective date of the amended provision currently in effect. The amending act expressly provided that it "shall not apply to the trial of any proceeding commenced prior to [December 5, 1974]." Pub.L.No.93–512, 93d Cong., 2d Sess., 88 Stat. 1609, 1610. This suit was filed in 1970.

■ We have elected to apply the new standards here since we could of course recuse even if not required to and would if we were in serious doubt as to what was right to do, and also because the new statute largely incorporates provisions of the Code of Judicial Conduct earlier in effect. We conclude that under either statute, federal judges need not disqualify themselves

because of the interest they might have as subscribers to a government-wide health insurance plan.

The unamended version of 28 U.S.C. § 455 (1970) reads:

Any justice or judge of the United States shall disqualify himself in any case in which he has a substantial interest, has been of counsel, is or has been a material witness, or is so related to or connected with any party or his attorney as to render it improper in his opinion, for him to sit on the trial, appeal, or other proceeding therein.

The new statute, 28 U.S.C. § 455 (1976), provides in pertinent part that:

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding where his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

\* \* \* \* \* \*

(4) He knows that he, individually or as a fiduciary \* \* \* has financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding \* \* \*.

A financial interest is defined, with certain exceptions as "ownership of a legal or equitable interest, however small \* \* \*." *Id.* at § 455(d)(4).

The amended version of § 455 presents a more exacting standard against which a judge's interest in a controversy, or in a party to such a controversy, is measured and in no instance relaxes a prior standard. Against this background we find that if a judge does not have a "financial" or "other interest" which would require disqualification under the amended § 455, then he clearly does not have a "substantial interest" in the case as the unamended § 455 would require for disqualification.

Thus, the questions presented are (a) whether the impartiality of federal judges who subscribe to the GWSBP might reasonably be questioned in a case where the court is asked to decide whether the insurers and/or directors thereof, owe fiduciary duties to all subscribers, judges among them, and (b) whether subscribing or other federal judges have a financial interest, however small, or "any other interest" that may be substantially affected by the outcome of the proceeding.

As to whether the impartiality of a subscriber to the Blue Cross and Blue Shield Plan might "reasonably be questioned," evidently the question does not lend itself to resolution by cut-and-dried formula and was not intended to. The statutory scheme was to prescribe a cut-and-dried formula in certain cases, and require disqualification when such cases occur, even if no one could reasonably derive from the circumstances of the case any reasonable doubt as to the judge's impartiality. But such formula could not be prescribed for every possible case, or the legislative task would never have been completed, thus other instances of necessary disqualification were stated as being all other cases when the judge's impartiality might reasonably be questioned. He could not refuse to recuse solely on the basis of his convictions of the purity of his motives; on the other hand, he was not required to recuse on the basis of supposititious and patently unreasonable suspicions. Here no recovery is intended to take the form of money payments to class members. The likelihood any recovery first of all would benefit the government, which carries part of the cost of the plan, rather than the subscribers, the uncertainty who would be a subscriber at the possibly remote future date when the benefits from successful prosecution of the suit actually inured, the evidence that rates to subscribers were often set according to competitive factors rather than by the health of the reserve fund, the comparative insignificance of the indirect benefit to any subscriber, supposing the benefit to inure to subscribers at all— all these are factors that would induce a reasonable person not to question a judge's impartiality merely because he was a subscriber, and we here assume, a beneficiary. We turn, therefore, from the disqualifica-

tion where impartiality might reasonably be investigated to the one that is cut-and-dried whether or not reasonable.

As between federal judges who presently subscribe to the health insurance program in question and those who do not, the subscribers present the worse case hence the best prospects for disqualification if there is to be any in this case. Though our ultimate decision is to the contrary, we have to assume for recusal purposes, that subscribers are beneficiaries. Thus, if the law does not mandate the disqualification of subscribers, nonsubscribers are a fortiori insulated from disqualification. It is to be recalled that a feature of the GWSBP is that federal employees may, at certain times of the year, become eligible to switch from one health insurance program to another. Thus, every federal judge will at intervals become eligible to be covered thereafter by the GWSBP. This eligibility interest is one that is significantly more attenuated and remote than is the interest of a subscribing federal judge and does not alter the view that subscribing judges present the better prospects for disqualification under the statute.

The statute makes a distinction between two kinds of interests, "financial" interests and "other" disqualifying interests. We do not think subscribing judges have either type to require recusal in this case. Section 455(d)(4)(iii) provides:

> The proprietary interest of a policy holder in a mutual insurance company, of a depositor in a mutual savings association, or a similar proprietary interest is a "financial interest" in the organization only if the outcome of the proceeding could substantially affect the value of the interest. * * *

The interest present here is a "similar proprietary interest," one that is analogous to the proprietary interest of a policyholder in a mutual insurance company. It is so held in Code of Judicial Conduct, Advisory Opinion No. 26 (1973). Indeed the proprietary interest of judges who subscribe to the health insurance plan in question is, in a manner of speaking, less proprietary. That is so because policyholders in a mutual insurance company by definition enjoy collective and entire ownership of the company, "each [policyholder] taking a proportionate part in the management of its affairs and being at once insurer and insured participating alike in its profits and losses." *Ohio Farmers Indemnity Co. v. Commissioner*, 108 F.2d 665, 667 (6th Cir. 1940). None of these features are present in this case.

Furthermore, in this case all plaintiffs seek is "to require the defendants to restore to the funds of the Plan administered by GHI the interest lost by the maintenance of large deposits of the Plan's funds in noninterest checking accounts in the banks with which officers and directors (trustees) of GHI had interlocking relationships." (Appellants' opening brief p. 5.) No recovery is sought for individual class members and it does not appear that any could be if the holding in a case plaintiffs would have us follow is correct. *Stern v. Lucy Webb Hayes National School*, 367 F.Supp. 536, 540 (D.D.C.1973). We, therefore, hold that the interest of subscribing federal judges is too contingent and remote to warrant disqualification in the circumstances presented. This analysis moots the question whether the "rule of necessity" *United States v. Will*, 449 U.S. 200, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980), would be for application in any event, and would require us to sit regardless.

## II

We turn to the merits of the case. Plaintiffs' initial argument is that because the Associations and GHI are nonprofit corporations, they and the GHI directors owed fiduciary duties to the subscribers as beneficiaries of the corporate activity. Plaintiffs claim, alternatively, that even if the subscribers are not owed fiduciary duties directly, they should be permitted to enforce fiduciary duties of the nonprofit corporate entities and of the individual directors in any event.

Plaintiffs cite *United States v. Mount Vernon Mortgage Corp.*, 128 F.Supp. 629 (D.D.C.1954), *aff'd*, 236 F.2d 724 (D.C.Cir. 1956), *cert. denied*, 352 U.S. 988, 77 S.Ct.

386, 1 L.Ed.2d 367 (1957) as support for the proposition that the directors of GHI owe them fiduciary duties. In *Mount Vernon,* the charitable corporation was a foundation with three trustees whose purpose was to spread culture and promote "good literature." 128 F.Supp. at 630. It lasted as an active foundation for less than 10 years, and when it folded, the trustees transferred valuable stock of the foundation for grossly inadequate consideration. The United States, as *parens patriae,* sued to cancel the transfer of stock. While the district court stated that "[t]he trustees of the Foundation occupied a fiduciary relationship to it and its unknown beneficiaries," 128 F.Supp. at 636, this court, in affirming the result, disagreed with the district court's characterization of the nature of the suit. We stated that "[t]he United States is not suing on behalf of particular beneficiaries, to enforce a 'private right, which might have been asserted without the intervention of the United States at all.' " 236 F.2d at 725 (quoting *United States v. Beebe,* 127 U.S. 338, 346, 8 S.Ct. 1083, 1087, 32 L.Ed. 121 (1887)), but that the suit was more "analogous to one brought to enforce a public right." *Id.* The present lawsuit is not analogous to the one brought in *Mount Vernon;* the plaintiffs are not the United States and they are not suing on a public right. The absence of the United States as a party plaintiff is, indeed, the most conspicuous deficiency in the case before us.

Furthermore, plaintiffs citation of *Mount Vernon* is inapposite. In *Mount Vernon,* we expressly recognized, without dispute, the existence of a charitable trust. In this case, plaintiffs seek to establish a trust as one of their alternative grounds for recovery. The citation of *Mount Vernon,* to that extent, thus begs the question.

Plaintiffs rely heavily on District Judge Gesell's second decision in *Stern v. Lucy Webb Hayes National Training School,* 381 F.Supp. 1003 (D.D.C.1974) to show that fiduciary duties run from the Associations, GHI, and directors of GHI directly to them. In *Stern,* the patients of a nonprofit hospital sued the trustees of the hospital claiming that the trustees had mismanaged the hospital's finances and thereby had breached a fiduciary duty. The issues before the court were what kind of fiduciary duties the directors of a nonprofit corporation have and whether any such duties were in fact breached.

Judge Greene's memorandum opinion reflects that he had considerable difficulty with his colleague's decision in the *Stern* case, both as to the question to whom the directors' duties were owed, and the related if not identical issue of who had standing to enforce them. He treats the *Stern* decision as constituting "novel precedent" and as representing the "outer limits of the imposition of liability on directors of non-profit corporations on trust theory grounds. * *" It is worthwhile to revert to the two *Stern* opinions to see how Judge Gesell was led to do what he did. The first, 367 F.Supp. 536, deals with preliminary motions to certify the class and grant partial summary judgment. The case involved prolonged maintenance of funds of a nonprofit hospital in noninterest bearing checking accounts of excessive size, in banks having as directors, individuals, also directors (called trustees) of the hospital. Plaintiffs were an alleged class of patients. The main thrust of the first opinion is to remove from the case counts under the antitrust laws, brandishing over the heads of the errant directors the fearsome weapon of treble damages. The patients, as a class, are held to lack antitrust standing, being neither in the "target area" (occupied by banks not having directors on the hospital board) nor directly injured by the alleged misfeasance. The opinion then proceeds with less analysis, to hold that even under the alternative breach of trust theory the patients could not be certified as a class to pursue money damages for themselves. The lack of connection between the alleged wrongs and any alleged enhancement in the bills of the patients, or more likely, their insurers, the constant changes in the costs of particular services, and the possible conflicts in the interests of various groups of patients, are mentioned. The conclusion is drawn that "the difficulties of attempting to manage

the class are almost insurmountable." But instead of dismissing the breach of trust counts also, the court allows them to stand, but with all members of the class barred from personal recovery of damages.

It is not clear from the published opinions whether Judge Gesell even had before him motions to dismiss entirely any other than the antitrust counts. Any apparent inconsistency in his handling of the two classes of claims is not reconciled by him. Judge Greene's surmise in his memorandum in the present case is as plausible an explanation as we can devise; it was considered that someone ought to be able to enforce the trustee's duties in litigation, and if the patients could not, there was no one else. The mere terror of a treble damages award may suffice for the antitrust laws, but for enforcing fiduciary duties, justice requires someone to have standing, and it was the patients or nobody. Here, however, there is the United States, closer to privity of contract, and more directly injured.

Plaintiffs contend that the district court misconceives the thrust of the second *Stern* decision when it concluded that *Stern* held that the trustees owe fiduciary duties to the hospital and not to its patients. They argue that nowhere in *Stern* is it suggested that the court meant to differentiate between the fiduciary duty to the hospital and to its patients. A close reading of *Stern* makes it sufficiently clear that the fiduciary duties of directors of a nonprofit hospital run to the hospital and not directly to the patients as beneficiaries. This point is illustrated where the *Stern* court states that "plaintiffs approach this matter as though each trustee of the Hospital were individually responsible for an abuse of fiduciary duty under an express trust which has made the Hospital's patients beneficiaries * * * [h]owever, the trustees here stand in a different status, * * *." 381 F.Supp. at 1018. The court further stated that it was constrained to "consider the appropriate relief" in light of its finding that the defendant trustees have breached their *fiduciary duties of care and loyalty to the Hospital. Id.* at 1017 (emphasis supplied). Throughout the opinion the *Stern* court makes express references to the existence of directors' fiduciary duties running to the hospital, no similar express references are made of any fiduciary duties running to patients. It is true, however, as plaintiffs point out that in the earlier opinion, *Stern v. Lucy Webb Hayes National Training School*, 367 F.Supp. 536, 540 (D.D.C.1973), the court stated:

> * * * "Plaintiffs purporting to represent a class of users of the Hospital's services have a sufficient special interest to challenge the conduct of the trustees operating this charitable institution on a theory of breach of trust." Plaintiffs unquestionably may proceed on behalf of all patients to press for appropriate injunctive relief and possibly an award of damages to be paid into the Hospital's funds * * *.

This passage is arguably an implied conclusion that the patients are owed fiduciary duties by the hospital's trustees, but, if so, the later decision is to the contrary, as is the fact the patients were allowed no money damages. A district court explained the *Stern* decision in *Newman v. Forward Lands, Inc.*, 430 F.Supp. 1320, 1322 (E.D.Pa. 1977) as follows:

> * * * [I]n *Stern* the only relief which the court allowed the plaintiffs was that which benefited the hospital itself, even though, presumably, such relief had an incidental benefit to the patients. Thus, the *Stern* court, in effect, allowed the patients to maintain an action in which the relief sought closely resembled that which would be obtained in a stockholders derivative suit. * * * (Footnote omitted.)

Along the same lines, the district court herein opined, as we have stated, that the *Stern* court allowed the patients to maintain their action, even though no duties were running to them, because if they could not challenge the directors' breaches of their duties, no one could. This is particularly apparent from the court's discussion in *Stern* where it points out that the hospital "is not closely regulated by any public au-

thority, it has no responsibility to file financial reports, and its Board is self-perpetuating." 381 F.Supp. at 1019.

Plaintiffs' citation of *Stern* does not support the proposition that nonprofit corporate entities owe a fiduciary duty to plaintiffs as subscribers. Therefore, *Stern* has no application with respect to the Associations and GHI. The only fiduciary duty that plaintiffs can conceivably enforce under *Stern* is that of the directors of GHI to GHI, and that is not what plaintiffs here seek to do.

Plaintiffs are suing the Associations and GHI in contract. All of the allegedly illegal actions arose out of various contractual obligations. Thus, plaintiffs argue that the Associations did not fulfill their duty specified in the Federal Contract, to invest those funds not required, in the Associations judgment, to meet current needs. Likewise, plaintiffs complain that the GHI directors, and GHI proper, did not invest the premium income in a proper manner, an obligation which they claim arose under the operations center subcontract with the Associations.

### III

▆ Plaintiffs' arguments on the existence of fiduciary duties is but the converse of its attempt to gain express trust treatment of the Federal Contract, an attempt we reject for reasons to be discussed below.

Plaintiffs also cite *Goodman v. Perpetual Building Association*, 320 F.Supp. 20 (D.D.C.1970), to support their argument that they should be allowed to enforce fiduciary duties whether owed to them directly or otherwise. Plaintiffs' position is not analogous to the plaintiffs in *Goodman*. Plaintiffs in *Goodman* sued directors of a building association, an unincorporated business, for breaches of duty to the business. Plaintiffs were members of the building association who made deposits and borrowed from the association; they received dividends from profits, had voting rights, the right to call meetings, and the right to attend the annual meeting. *Id.* at 24–25. They were much more analogous to shareholders than

plaintiffs herein and as such distinguishable from the subscribers who are suing as "beneficiaries" of a nonprofit corporation.

Plaintiffs rely on a resolution by the GHI board of directors for the proposition that the GHI directors owed fiduciary duties to the subscribers.

In a resolution passed by the GHI board on June 26, 1970, the following quotation appears: "[a]ll * * * trustees occupy a fiduciary relationship to the corporation and to its subscribers. Their primary duty as trustees is to GHI and its subscribers rather than to the person or party appointing them as trustees." (Joint Appendix at p. 263.) Defendants reply that this evidence is inadmissible since laymen's opinions on legal issues are not generally admissible as evidence. Plaintiffs offer no argument in opposition on this point. Judge Gesell has a relevant paragraph in the second *Stern* opinion, 381 F.Supp. at 1013, pointing out that the duties and liabilities of so-called trustees of charitable corporations are really more like those of directors of business corporations.

▆ The existence of fiduciary duties in the context of this case is a legal conclusion. The duty to issue such conclusions devolve on the courts and lay legal conclusions are inadmissible in evidence. *Avignone v. Roumel*, 13 F.2d 292, 296 (D.C.Cir. 1926); *United States v. Johns-Manville*, 245 F.Supp. 74, 84 (E.D.Pa.1965); *Manter v. Bay State York Co.*, 159 F.Supp. 670, 671 (D.Mass.1958). The presence of this resolution therefore does not create fiduciary duties running to subscribers from the directors of nonprofit corporations where otherwise none are found to exist.

Finally, on this point, plaintiffs attempt to extract from a series of contractual relationships between the government, the Associations, the local Plans, GHI and its directors, and the subscribers, fiduciary duties that must indeed travel a tortious path if it is to reach them. Plaintiffs should not be permitted to maintain their claim that would give them redress on the basis of a theory which, to quote Judge Greene, "as-

sumes that a fiduciary duty runs from the directors of these non-profit corporations to the corporations themselves, from the corporations to all parties contracting with the corporations, and finally from all contracting parties to the beneficiaries of those contracts." [Memo. order at p. 11.]

## IV

In its effort to show the existence of fiduciary duties running to them, plaintiffs alternatively contend that the Plan funds administered by GHI constitute an express trust fund. The argument is grounded upon (a) a requirement in the contract between the Associations and GHI that the funds of the GWSBP be maintained in accounts separate from other funds; and (b) requirements in the Federal Contract that payments to the Association in excess of current needs be invested and interest thereon be credited to the Special Reserve; and that any excess of subscription income over expenses credited to the Special Reserve be used to reduce premiums.

In rebuttal, defendants contend that as an insurance contract the GWSBP does not create a trust in favor of policyholders; that this group insurance contract is a third party beneficiary contract for the benefit of subscribers rather than a trust; that there is no evidence of an intent to create a trust; and finally, that the cases cited by plaintiffs in support of their trust theory are not analogous or relevant. We affirm the lower court's disposition of this matter.

█ It is settled that the mere existence of a contractual relationship does not preclude the existence of a trust relationship between the parties to the same contract. *See* Bogert, Law of Trusts, § 28 (5th ed. 1973). Thus, although the Federal Contract between the Associations and the Commission is a third party beneficiary contract, this fact in and of itself does not exclude the possibility that a trust was also created in favor of the subscribers to the GWSBP. Plaintiffs do not appear to contest the trial court's determination that the Federal Contract, whatever else it was, constituted a third party beneficiary contract. What

plaintiffs maintain, and correctly so, is that the existence of contracts is not incompatible with the existence of an express trust.

█ A third party beneficiary contract is not the equivalent of or always a trust. If property is transferred from one person to another who agrees to assume a personal liability to a third person, the resulting relationship is that of a third party beneficiary contract, not that of a trust. Restatement (Second) of Trusts § 14, Comment f. The Blue Cross and Blue Shield plans, through the Associations, obligate themselves to pay all of the covered hospital and physician services obtained by the subscribers during the contract period regardless of cost. This means that the insurers undertake personal liability for the subscribers' incurred hospital and physician service expenses, in case of any shortfall, recoverable from their own funds if necessary, and not just from the res of the alleged trust. This element of personal liability is the critical element of the Federal Contract which make it a third party beneficiary contract and not a trust.

That the insurers are in this way liable under the Federal Contract is not disputed by plaintiffs; what plaintiffs urge is that this liability is assumed apart from defendants' obligations to administer the Plan funds. Plaintiffs say that the insurers' personal risk is assumed as the quid pro quo for the special risk charges provided for by the contract. Plaintiffs would have the court construe the Federal Contract as (at least) two separate contracts; the first in which the Commission and the insurers through the Associations agree to provide health benefits and to deal with subscription funds only for the benefit of the subscribers; and the second where the insurers agree to assume a risk for any covered costs incurred by subscribers in the first contract in consideration of the special risk charges. Plaintiffs advance no plausible reason and we have not been alerted to any evidence that permits such a reading of the Federal Contract. The assumption of liability was made in the context of the entire Federal Contract, as one of the many obligations

assumed thereunder and not as part of a separate agreement. The fact that risk charges are assessed does not eliminate the liability of the insurers. For example, if the Federal Contract is terminated and the Special Reserve is negative or insufficient to cover all outstanding obligations, the Plans are obliged to pay the deficits from their own general assets.

Plaintiffs urge that this single aspect of liability arising under the Federal Contract does not negate the other factors which establish a trust. Of these "other factors," plaintiffs rely heavily on the requirement that Plan funds be segregated and accounted for separately. The source of the segregation of funds requirement is the operations center contract between the Associations and GHI, not the Federal Contract. The Commission imposed no requirements on the Associations to segregate the premium funds or otherwise deal with the premiums as trust property. Therefore, unless we can attribute the segregation requirement from the Associations/GHI agreement to the Commission as the alleged settlor, this aspect of plaintiffs' argument would fail to show any manifestation of an intention to create a trust. Plaintiffs argue that the Federal Contract contemplates that Plan funds be held and accounted for separately because shortly after the execution of that contract, the Associations and GHI entered into their agreement expressly providing for segregation of Plan funds. Furthermore, they argue, the Plan's basic contracts with the Associations were renewed annually by the Commission with knowledge of the segregated accounts requirement. We are not persuaded by these arguments that the segregated accounts requirement can properly be attributed to the Commission. The segregation requirement did not exist at the time the Federal Contract was executed. The mere fact that the Commission knew that the Associations imposed a segregation requirement in their agreement with GHI tells us nothing either way. It is just as plausible to argue that failure to amend the Federal Contract, with knowledge of the Associations/GHI agreement segregated accounts provision to require the Associations to maintain separate accounts, demonstrates that the Commission had no intention to create an express trust.

With respect to the subcontract with GHI, the fact that the Associations subsequently required GHI to separate Federal Contract premiums from GHI's local operations as a Blue Cross plan simply reflected the fact that GHI was acting as an operations center, not as a local Blue Cross plan.

Finally, the other factors which plaintiffs emphasize, are in fact standard conditions in insurance contracts. The requirement to return the Special Reserve on termination of the contract, if it is positive, is common to large experience-rated group insurance contracts. Likewise, the requirement to make an accounting to the Commission and the payment of a risk charge are standard in experience-rated contracts.

The Act defines "health benefits plan" as a "group insurance policy or contract * * * provided by a carrier for the purpose of providing, paying for, or reimbursing expenses for health services." 5 U.S.C. § 8901(6). It goes on to state that " 'carrier' means a voluntary association, corporation, partnership or other nongovernmental organization * * * engaged in providing, paying for, or reimbursing the cost of, health services under group insurance policies or contracts * * * *in consideration of premiums* or other periodic charges * * *." 5 U.S.C. § 8901(7). (Emphasis supplied.) These and numerous other repeated references to the word "contract" in the Act reinforce our view that the Federal Contract contemplates contractual not trust relationships.

The cases cited by plaintiffs are not analogous to the facts we have before us. For example, *Taylor v. Benham*, 46 U.S. (5 How.) 233, 12 L.Ed. 130 (1847) involved a trust created by a will with a named trustee, thus, the intent to create a trust could hardly be questioned. Plaintiffs rely on a quotation appearing in *Taylor v. Benham* to the effect that—

* * * "every person who receives money to be paid to another, or to be applied to a particular purpose, to which he does not apply it, is a trustee, and may be sued either at law, for money had and received, or in equity, as a trustee, for a breach of trust." [Cases omitted.] *Id.* at 274.

The source of that quotation is the earlier New York Chancery Court case of *Kane v. Bloodgood*, 7 Johnson Ch. 90, 110–11, 2 N.Y. Ch.Rep. 23 (1823), which stands for the proposition that a creditor is not automatically a trustee, despite the quotation which seemed to imply to the contrary. Thus, the quotation from *Taylor v. Benham* must be read in the context of that decision. The case relates to instances in which traditional trust obligations knowingly and willingly were undertaken by the fiduciary. This is in sharp contrast to the contractual relationship between the Commission and the Associations where the latter underwrote certain health insurance risks in consideration of the premiums.

Another decision cited by the plaintiffs, *City of Philadelphia v. Lieberman*, 112 F.2d 424 (3d Cir.), *cert. denied*, 311 U.S. 679, 61 S.Ct. 48, 85 L.Ed. 438 (1940), is equally inapposite to this case. In *Lieberman*, an insurance company had been required, in order to qualify as surety on certain municipal construction contracts, to deposit bonds with a face value of $100,000 with a trust company. Creditors of the surety which had been ordered liquidated by a court of competent jurisdiction, sought to obtain the bonds and the city objected, claiming that the bonds were held in trust for the city. The court observed that the active duties imposed on the trust company included collecting and paying interest on the deposited securities to pay judgments against the city, and holding the remaining securities to be returned to the insurance company upon the consent of the city. 112 F.2d at 426. These customary trust duties contrast sharply with the duties of the Associations under the Federal Contract. Whereas the trust company in *Lieberman* undertook to receive, manage, and distribute specific assets, the insurers through the Associations undertook to pay health insurance claims regardless of the sufficiency of premiums and interest income thereon and backed up that promise with all of their assets.

Another decision cited by plaintiffs, the decision of the second circuit in *In re Interborough Consolidated Corp.*, 288 F. 334, *cert. denied sub nom. Porges v. Sheffield*, 262 U.S. 752, 43 S.Ct. 700, 67 L.Ed. 1215 (1923) which cites *Taylor v. Benham, supra*, and *Kane v. Bloodgood, supra*, appears to contradict plaintiffs' position. In that case, the court held that a fund deposited with a bank for payment of interest to coupon holders did not create a trust even though the fund was set aside for that specific purpose. 288 F. at 345.

We have examined the other cases cited by the plaintiffs and find them to be inapplicable to the facts of this case insofar as those cases are intended to support plaintiffs' trust theory.

Defendants cite *Equitable Life Assurance Society v. Brown*, 213 U.S. 25, 29 S.Ct. 404, 53 L.Ed. 682 (1909), for the proposition that an insurance contract does not create a trust in favor of policyholders. To read *Brown* this broadly would be to hold that the existence of any insurance contract precludes a trust relationship under that contract between the insurer and the insured. We cannot go that far. The *Brown* case must be read in light of the fact that it is a diversity case applying the law of New York as revealed in decisions of New York courts. It does not purport to state federal law or that of the District of Columbia. Secondly, it came down while the distinction between law and equity was fully maintained. It was an equity case. Since trusts were a branch of the law of equity, it was appropriate to determine, and the Court did determine, whether the complaint alleged an equitable right. Whether the same facts might ground a legal liability on some other theory was not before the Court.

To recover in equity, complainants had to show and tried to show that the assets of the Equitable company were a trust res

because of the mutual nature of the policy-holders' rights and the limitations on those of the stockholders. They said the directors had dissipated assets in which they had an equitable interest. They did not seek to enforce directors' liabilities; they wanted the court to take direct control of Equitable by a receivership. But they could not show Equitable was in any danger of inability to fulfill its insurance contracts to the letter. Thus the complaint "wanted equity" because plaintiffs failed under New York law to allege any interest the law recognized as an equitable or beneficial interest in the company assets, while, on the other hand, their contract rights were in no jeopardy.

With all the caution necessary in dealing with this old case as authority, we still think it throws doubt on plaintiffs' claims herein. It teaches one to look for something quite specific in the statement of a trust relationship, before one reads such a relationship into the ordinary rights of insurer and insured. Plaintiff in *Brown* could put his finger on a more specific "trust res" than plaintiffs here, and he alleged more basis for assertion of beneficial or equitable interests in that res, inuring to himself.

### V

In summary we hold that Judge Greene's conclusion that the Federal Contract does "not fit the traditional trust category" is correct. If the Federal Contract is a third party beneficiary contract, the subscribers have enforceable rights to payment of their covered physician and hospital bills without limitation according to the terms of the plan they subscribed to—and, in fact, that is exactly what the parties bargained for and what the contract provides. On the other hand, if the contract were a trust, the obligation of the insurers to pay health benefits to subscribers would naturally be limited to the sum of the premiums paid and any earnings thereon—a limitation which no one bargained for and which is not present in the Federal Contract.

The decision of the lower court is

*Affirmed.*