J.O. TALLY, Jr., Executor,
Etc., Plaintiff,

v.

DEAN WITTER REYNOLDS,
INC., Defendant.

DEAN WITTER REYNOLDS, INC.,
Third-Party Plaintiff,

v.

J.O. TALLY, Jr., Third-Party Defendant.

Civ. A. No. 82–0375.

United States District Court,
District of Columbia.

Nov. 5, 1982.

Worth Rowley, Rowley & Watts, Washington, D.C., for plaintiff.

Edward M. Statland, Washington, D.C., for defendant.

## DECISION AND ORDER

JACKSON, District Judge.

This is an action for breach of contract and negligence by a customer against a stockbroker who allegedly permitted an unauthorized withdrawal of funds from the customer's money market account which were later embezzled. Because the account was held by the customer in a fiduciary capacity and the funds were transferred to his personal account from which the actual embezzlement occurred, the stockbroker filed a third-party complaint against the customer personally for indemnity for his alleged negligence in permitting the unauthorized withdrawals from both accounts. Upon the following facts, as found by the Court in accordance with Fed.R.Civ.P. 52(a) upon trial without a jury, the Court concludes, for the reasons hereinafter set forth, that judgment must be given for defendant and the third-party complaint dismissed as moot.

### Findings of Fact

Plaintiff J.O. Tally, Jr., is a lawyer with a Fayetteville, N.C., law firm who has been the resident lawyer in its Washington, D.C., office since 1970 specializing in representing North Carolina municipalities before government agencies. In 1973 he hired one Janet Wayson as secretary, office manager, and bookkeeper. As his confidence in her grew, he gave her substantial ministerial control over his personal financial affairs. In 1976 Tally's wife became ill, and she gave him power of attorney by which he took control of her bank accounts and turned over management of those accounts as well to Wayson. Tally's wife died in December, 1977, and he was appointed executor of her estate. Wayson continued to do the estate bookkeeping, reviewing and reconciling bank statements, assembling bills and drawing checks to pay them (which were, however, supposed to be

presented to Tally for signature), as she did for Tally's own accounts. By 1978 Wayson was overseeing as many as 10 checking and savings accounts for Tally with minimal supervision and was regarded by him as a long-time trusted employee. Although Tally initially bonded her through the North Carolina office, Wayson's bond was allowed to lapse.

In early 1978 Tally met with John H. Westerfield, an account executive in the Washington branch office of defendant Dean Witter Reynolds, Inc., ("Dean Witter") and informed Westerfield that he was looking for a competent stockbroker in Washington. Apparently satisfied with Westerfield's qualifications, Tally engaged him and introduced him to Wayson, advising that she would be delivering instructions from time to time in connection with the accounts he intended to open with Dean Witter, and that Westerfield should treat those instructions as if they had come from Tally himself. Tally asserts that he intended Wayson's authority to extend only to buy-and-sell orders in security transactions, but the limitation was never expressed to Westerfield. Tally and Westerfield disagree on the fulsomeness of Tally's description of the extent of Wayson's dominion over his banking affairs, but its import was clear that Wayson would be speaking for Tally insofar as transactions with Dean Witter were concerned. In May, 1978, Tally opened a Dean Witter account for his fiancee, a Mrs. Hatry, from whom he had power of attorney, and sometime thereafter he opened a personal account. Tally and Westerfield agree that nearly half the transactions in those accounts were ordered by Wayson purporting to be relaying instructions for Tally. Westerfield initially sought to confirm instructions received from Wayson with Tally personally but was given to understand confirmation was unnecessary, and he then acted upon Wayson's instructions alone without objection from Tally.

In anticipation of estate taxes and expenses in his deceased wife's estate, Tally arranged with Westerfield to open an estate money market account with Dean Witter, and on March 5, 1979, Wayson transmitted Tally's executor's check for $40,000 to open the account by a letter on Tally's stationery over her own signature as "secretary to Mr. Tally." In April Tally opened a fourth account (also money market) with Dean Witter for a North Carolina charitable trust client.

As it does for all of its customers Dean Witter routinely sent Tally monthly statements for each of the accounts subject to his control. Tally never examined the statements directly but relied instead upon "summaries" prepared for him by Wayson which simply presented the end-of-month balance in each.

In mid-September, 1979, Tally personally telephoned Westerfield to inform him that he expected to be withdrawing funds from the estate account shortly and that Wayson would advise him of the exact amount. On September 24, 1979, Wayson did call and instructed Westerfield that Tally wanted $25,000 withdrawn from the estate account and a check in that amount, payable to J.O. Tally personally, deposited in his personal account at Union First Bank. Westerfield informed Wayson he needed instructions in writing to do so,[1] so Wayson originated a mailgram in Tally's name the following day reiterating her oral instructions, and Westerfield deposited the $25,000 himself at Union First on September 25th. A few days later Westerfield mentioned to Tally that he had personally delivered the $25,000 check to the bank transferring estate funds to Tally's personal account (hoping to impress Tally with his extraordinary service), eliciting, however, no response from Tally of either gratitude or surprise.

---

1. Dean Witter requires written instructions when its check is to be made payable to one other than the "plate" name, i.e., the name on the account itself. (The estate account was held in the name of "J.O. Tally, Executor of the Estate of Zelda Tally.") It requires letters testamentary, a power of attorney, or similar instrument only for "discretionary" decisions by one other than the account owner.

In December of 1979, when one of Tally's checks to (or for) his son was dishonored,[2] Tally sent Wayson to his accountants to explain. The ensuing investigation by the accountants disclosed that Wayson had, by forging Tally's name on "scores" of checks on various accounts beginning in 1976, embezzled approximately $118,000 in total from Tally, including $10,450 of the $25,000 transferred from the estate account at Dean Witter to Tally's personal account at Union First. On February 8, 1980, Wayson "confessed" the embezzlement to Tally who promptly called Westerfield to advise him that he should no longer take instructions from her. In another call to Westerfield a few days later Tally intimated that he thought Dean Witter might be liable and suggested that Westerfield alert the firm's insurance carrier. No demand was ever made, however, until this action was filed in February of 1982.[3]

### Conclusions of Law

Plaintiff contends that his contract with defendant required that transactions in the estate account—indeed, in all his accounts—be executed only as authorized by him. He did not, he asserts, expressly authorize Wayson to order cash withdrawals (notwithstanding she could order securities transactions) and that any apparent authority she might have derived from prior dealings with Dean Witter on plaintiff's behalf was dispelled by what Dean Witter should have recognized as an irregular transaction—a transfer of funds held in a fiduciary capacity to the personal bank account of the fiduciary.

■ Insofar as plaintiff's contract claim is concerned, the Court concludes that Janet Wayson had both actual and apparent authority to conduct the transaction in question. *See Insurance Management of Washington, Inc. v. Eno & Howard Plumbing Corp.,* D.C.App., 348 A.2d 310 (1975); 3

*Am.Jur.2d* "Agency" § 74 (1962). And nothing about Wayson's withdrawal of funds from Tally's estate account for deposit in his personal account served to dispel the appearance of her authority to accomplish it. Even if in certain circumstances a transfer of funds from a fiduciary to a personal account might impart constructive knowledge of a breach of duty by the fiduciary, *see Stern v. Lucy Webb Hayes Nat. Training School for Deaconesses and Missionaries,* 381 F.Supp. 1003, 1016–17 (D.D.C. 1974), it does not follow that it also gives notice that the fiduciary's agent is an embezzler. Moreover, even if Wayson's withdrawal was unauthorized, it cannot be said to be the legal cause of any loss to the estate, because the funds were transferred to the fiduciary who, but for the dishonesty of his agent, would be in a position to restore it to the estate, a circumstance not within the contemplation of Tally and Dean Witter when the accounts were opened. *See Mark Keshishian & Sons, Inc. v. Washington Square, Inc.,* D.C.App., 414 A.2d 834, 841–42 (1980); *Sears Roebuck & Co. v. Goudie,* D.C.App., 290 A.2d 826, 832 (1972); *Fowler v. A & A Co.,* D.C.App., 262 A.2d 344, 349 (1970). Defendant would not be liable (in contract at least) had it delivered the $25,000 in cash directly to plaintiff from whom Wayson had later stolen it, and the situation is not altered by the fact that the funds were placed by Wayson in an account to which only plaintiff controlled access.

■ Plaintiff's claim in negligence is also untenable. Plaintiff offered no evidence that there is a special stockbroker's standard of care in ascertaining the authority of a customer's agent to order transactions in his account, and the Court concludes from the evidence that *was* received that Westerfield acted reasonably in the circumstances and Tally did not. Wayson was virtually unsupervised for years in her handling of Tally's personal and professional accounts,

---

**2.** Checks drawn on Union First bank had apparently been dishonored beginning in May, 1979, although Tally insists he remained ignorant of them because of Wayson's adroit manipulations of funds between accounts.

**3.** Tally ultimately recovered a judgment against Wayson which has been partially satisfied, and he is pursuing claims against the banks which paid out funds to her over her forgeries.

and if Tally remained oblivious to her defalcations it was solely because he allowed her to intercept the routine reports sent to him regularly by both defendant and the banks which were intended to alert him to irregularities in their management. *See Kiernan v. Union Bank,* 55 Cal.App.3d 111, 127 Cal. Rptr. 441, 444 (1976); *Fid. & Cas. Co. of N.Y. v. Constitution Natl. Bank,* 167 Conn. 478, 356 A.2d 117, 121 (1975); *Westport Bank & Trust Co. v. Lodge,* 164 Conn. 604, 325 A.2d 222 (1973); *Terry v. Puget Sound National Bank,* 80 Wash.2d 157, 492 P.2d 534 (1972).

Finally, if Tally had not been derelict himself defendant's allegedly unauthorized disbursement would not be a proximate cause of his loss. Wayson's criminal conduct is a wholly superseding cause which defendant had absolutely no basis to foresee. *See Lacy v. District of Columbia,* D.C. App., 424 A.2d 317, 323 (1980); *St. Paul Fire & Marine Ins. Co. v. James G. Davis Construction Corp.,* D.C.App., 350 A.2d 751 (1976).

For the foregoing reasons, it is, this 4th day of November, 1982,

ORDERED, that judgment be entered for defendant; and it is

FURTHER ORDERED, that the third-party complaint is dismissed as moot.